## Richmond

RONALD W. GREENFIELD v. COMMONWEALTH OF VIRGINIA.

April 22, 1974.

Record No. 730700.

Present, All the Justices.

*Stephen A. Saltzburg (E. Gerald Tremblay,* on brief), for plaintiff in error.

*Gilbert W. Haith, Assistant Attorney General (Andrew P. Miller, Attorney General,* on brief), for defendant in error.

I'Anson, J., delivered the opinion of the court.

Defendant, Ronald W. Greenfield, was tried by a jury for the murder of Mary Frances Jordan, found guilty of murder of the second degree, and his punishment was fixed at twenty years in the penitentiary. He was sentenced accordingly, and he is here on a writ of error.

Defendant contends that the trial court erred in refusing (1) to allow a psychiatrist to state in detail the basis for his opinion that the defendant was unconscious at the time of the alleged crime; (2) to allow the psychiatrist to hypnotize the defendant during a recess of his trial for the purpose of jogging his memory before testifying; (3) to grant a change of venue because of press coverage of the case; and (4) to suppress the introduction into evidence of some of his clothes, which the police took from him without a search warrant while he was in custody.

The evidence shows that on the night of November 7, 1972, the defendant and Mary Frances Jordan, the deceased, were employees of Poe's restaurant and beer parlor near the University of Virginia in Charlottesville. The deceased, a 21-year-old college student, was a waitress, and the defendant, 17 years of age, was a doorman at the establishment.

Defendant testified that it was raining quite heavily that night and Mary Frances offered him a ride home. About 12:30 on the morning of November 8, they left Poe's with Mary Frances using the defendant's green "army-type" jacket to shield herself from the rain while going for her car. Defendant waited for her under an awning in front of Poe's. After Mary Frances picked him up, she drove to a parking lot near his apartment where they sat and talked for about

fifteen minutes. She criticized him for his use of drugs, which he resented, but both were on friendly terms before he left the car. He had consumed heroin early in the evening and some psilocybin (a hallucinogenic drug) later that same night before leaving the restaurant. He said that as he was alighting from the car he felt a falling sensation, and the next thing he could remember was awakening and finding himself on the ground about fifteen feet away from the car on the driver's side. When he got up, he saw a person running from the scene, Mary Frances lying motionless in a pool of blood on the driver's side of the car, and his pocket knife on the car floor. He picked up the knife and put it in his pocket. He then noticed that his hand was cut and bleeding. He concluded that he must have "freaked out" and that he had killed her. He fled from the scene and eventually got a ride to Richmond with a truck driver.

Around 12:25 a.m. a college student, who lived near the parking lot where the deceased and defendant had parked, thought he heard a woman screaming. Responding to those screams, he left his apartment, observed a man wearing an olive army coat running from the parking lot, and saw the victim lying beside the open door of her car on the driver's side. He carried her to his apartment, and called the rescue squad and the police. The victim died shortly thereafter at the University of Virginia Hospital. The cause of her death was multiple stab wounds.

During the daylight hours of November 8th, defendant was arrested at a hospital in Richmond where he had sought medical attention for his hand. After receiving his *Miranda* rights, the defendant freely and voluntarily made a statement to a Richmond detective who took it down in longhand. The statement, in part, contained an admission that he killed the deceased and that the knife taken from him by the police was the murder weapon.

While en route to Charlottesville, the defendant told a Charlottesville detective: "I don't feel bad about taking her life. . . . I don't feel bad about taking a human being's life."

After arriving at the Charlottesville jail, the police gave defendant some clean clothes and took from him the clothing he was wearing. An analysis of defendant's clothing revealed bloodstains of deceased's blood type. Bloodstains of the defendant's blood type were also found on some of deceased's clothing.

Dr. Kenneth R. Locke, a psychiatrist, testified that he had made a diagnosis of defendant's mental condition. He had two interviews

with the defendant in the Charlottesville jail and put him under hypnosis for the purpose of trying to get him to recall what happened between the time he was leaving the automobile and when he found the victim had been stabbed. He obtained additional information about the defendant from talking with his parents and sister, examination of his school and medical records, and a review of the report of a recent psychiatric evaluation of the defendant by Dr. Showalter, a local psychiatrist. In making a clinical diagnosis of the defendant, he considered "what is called in psychiatry an adolescent adjustment reaction," which he explained as covering a broad spectrum of emotional disorders that occur in adolescents. He said that the defendant has indications of depression, as a consequence of which he "has a great deal of difficulty coming to terms with himself . . .," but there is nothing however to indicate that he is schizophrenic. Continuing, he said the "secondary diagnosis is less clear and harder to document but for which there is considerable evidence, and . . . that Mr. Greenfield might very possibly have minimal brain damage from birth trauma." Minimal brain damage, the doctor said, "is important from a medical standpoint because it can form a causative relationship" of defendant's adolescent adjustment reactions.

Dr. Locke stated that based on the interviews with the defendant (excluding what defendant had told him while under hypnosis), the information given him by members of defendant's family, a review and analysis of defendant's school and medical records, and after listening to defendant's testimony in his trial, it was his opinion that the defendant was unconscious at the time the homicide was committed. He said, however, that he had insufficient data to express an opinion on the cause of defendant's unconsciousness.

During a court recess, and prior to defendant's taking the stand, Dr. Locke hypnotized the defendant for the purpose of jogging his memory, but this did not help him recall what happened during the interim between his leaving the car and awakening on the ground.

Defendant's argument in support of his first contention is divided into two parts. He first argues that the trial court's refusal to allow Dr. Locke to testify in detail on what the members of defendant's family had told him, and the detailed information in defendant's school and medical records, as the basis of his opinion that defendant was unconscious at the time of the homicide, denied him a fair trial and violated due process and equal protection of the laws. This testimony, he claims, could have exonerated him, or at least would have had an impact on the grade of the homicide.

Unconsciousness is a state of mind of persons of sound mind suffering from some voluntary or involuntary agency rendering them unaware of their acts. *See* 22 C.J.S., Criminal Law, § 55 at 194.

■ Where not self-induced, unconsciousness is a complete defense to a criminal homicide. But self-induced unconsciousness goes only to the grade of the offense and not to the existence of a complete defense. *See, e.g., State v. Mercer*, 275 N.C. 108, 115-20, 165 S.E.2d 328, 334-36 (1969); *People v. Newton*, 8 Cal.App.3d 359, 376, 87 Cal.Rptr. 394, 404-05 (1970); *State v. Utter*, 4 Wash.App. 137, 141-43, 479 P.2d 946, 950 (1971); *Commonwealth v. Crosby*, 444 Pa. 17, 21-23, 279 A.2d 73, 76 (1971). *See also, Gills v. Commonwealth*, 141 Va. 445, 450, 126 S.E. 51, 53 (1925); and *Chittum v. Commonwealth*, 211 Va. 12, 17-18, 174 S.E.2d 779, 782-83 (1970) (on the question of drunkenness as a defense).

Despite defendant's argument to the contrary, the record discloses that Dr. Locke was permitted to state, within the proper rules of evidence, the basis of his opinion that defendant was unconscious at the time the homicide was committed. He told the jury the nature of his diagnosis, the nature of the diagnostic tools used, and the extent of his examination of the defendant.

A detailed statement of what the members of defendant's family told Dr. Locke would have been hearsay and could have confused the jury with evidence that had no probative value. The same is true of defendant's school and medical records.

In *Rollins v. Commonwealth*, 207 Va. 575, 582, 151 S.E.2d 622, 627 (1966), where the defense was insanity, we held that two batches of hospital records containing letters, newspaper articles, photographs and memoranda of various kinds by various people were not admissible for any purpose.

From all the data Dr. Locke, an expert, had obtained relating to defendant's state of mind, including what was excluded by the trial court, he was unable to determine the cause of the unconsciousness. Hence, a more detailed statement of the data obtained by Dr. Locke would not have aided a jury of laymen in determining whether the unconsciousness was induced voluntarily or involuntarily.

■ Moreover, there is nothing in the record disclosing what additional admissible data could have been shown as a basis for Dr. Locke's opinion that the defendant was unconscious at the time of the homicide. There was no proffer of such evidence. Thus, the exclusion of the more detailed testimony was not error. At most, under the circumstances here, it was harmless. *See Blount v. Commonwealth*,

213 Va. 807, 811, 195 S.E.2d 693, 696 (1973); *Lewis* v. *Commonwealth*, 209 Va. 602, 608, 166 S.E.2d 248, 253 (1969).

■ The second part of defendant's argument under his first assignment of error is that the trial court should have permitted Dr. Locke to state what he learned from the defendant while he was under hypnosis. Defendant concedes that there is no law in this Commonwealth to support his argument, but he says several other states have admitted hypnotic evidence under limited circumstances. He argues that the hypnotic evidence should have been admitted in the present case in order to fully develop his defense because there were no eyewitnesses to the crime, he had no memory of having committed the crime, and he was not identified as the man seen running from the scene of the crime.

It is true, as defendant says, that a few jurisdictions have permitted hypnotic evidence to be admitted under limited circumstances. In those jurisdictions where such evidence has been admitted, its admissibility has rested in the sound discretion of the trial judge. But even in those jurisdictions, the trial judge in exercising his discretion must weigh the probative value of defendant's statements under hypnosis as part of the expert's opinion against the risk of the jury considering it "as independent proof of the facts recited." *See People* v. *Modesto*, 59 Cal.2d 722, 382 P.2d 33, 31 Cal.Rptr. 225 (1963); *People* v. *Hiser*, 267 Cal.App.2d 47, 72 Cal.Rptr. 906, 41 A.L.R.3d 1353 (1968); *State* v. *Harris*, 241 Ore. 224, 405 P.2d 492 (1965).

In *Harding* v. *State*, 5 Md.App. 230, 246 A.2d 302, *cert. denied*, 395 U.S. 949 (1968), relied on by the defendant, the prosecuting witness in a rape case was put under hypnosis sometime before trial for the purpose of restoring her memory. In allowing her testimony, the court emphasized the fact that her testimony was substantially corroborated by other evidence. 5 Md.App. at 246-47, 246 A.2d at 312.

Most experts agree that hypnotic evidence is unreliable because a person under hypnosis can manufacture or invent false statements. *See* 3A Wigmore, Evidence, § 998 at 943, Chadbourn (rev. 1970); "Hypnosis as a Defense Tactic," 1 Toledo L. Rev. 691, 700 (1969); Note: "Hypnotism and the Law," 14 Vand. L. Rev. 1509, 1518 (1961); Herman, "The Use of Hypno-Induced Statements in Criminal Cases," 25 Ohio St. L. J. 1, 27 (1964). A person under a hypnotic trance is also subject to heightened suggestibility. McCormick, Law of Evidence, § 208 at 510 (2d ed. 1972). There it is said:

"Declarations made under hypnosis have been treated judicially in a manner similar to drug-induced statements. The hypnotized

person is ultrasuggestible, and this manifestly endangers the reliability of his statements. The courts have recognized to some extent the usefulness of hypnosis, as an investigative technique and in diagnosis and therapy. However, they have rejected confessions induced thereby, statements made under hypnosis when offered by the subject in his own behalf, and opinion as to mental state based on hypnotic examination." (Footnotes omitted.)

*See also* Note: "Hypnotism, Suggestibility and the Law," 31 Neb. L. Rev. 575, 576 (1952).

In fact, we have held that "truth serum" test results were properly excluded by the trial court because they were unreliable and led to self-serving answers. *See Orange v. Commonwealth*, 191 Va. 423, 439, 61 S.E.2d 267, 274 (1950).

We agree with the vast majority of authorities which have concluded that hypnotic evidence, whether in the form of the subject testifying in court under hypnosis or through another's revelation of what the subject said while under a hypnotic trance, is not admissible.

The defendant says that the order of the trial court directing that he not be put under hypnosis during a recess of the trial deprived him of the opportunity to have his memory jogged before taking the witness stand.

During a recess of the trial the defendant was put under hypnosis and he was brought out of the trance. Dr. Locke told the trial judge that the test had not been successful in improving the accused's memory, and the judge directed Dr. Locke not to try it again.

*Harding v. State, supra*, rests on facts entirely different from those in the present case and is not persuasive here.

We find no error in the action of the trial court.

█ Defendant says that the court erred in denying his motion for a change in venue because intensive press coverage may have prevented him from receiving a fair trial.

The burden was on the defendant to demonstrate by affirmative evidence that he could not obtain a fair trial in Charlottesville. "A motion for a change of venue is addressed to the sound discretion of the trial judge, and his action in overruling such a motion will not be reversed unless the record affirmatively shows that there has been an abuse of that discretion." *Maxwell v. Commonwealth*, 169 Va. 886, 890, 193 S.E. 507, 509 (1937); *Foster v. Commonwealth*, 209 Va. 297, 302-03, 163 S.E.2d 565, 569 (1968).

A reading of the newspaper articles found in the record reveals that they were fairly accurate and temperate accounts of a matter of public interest. The absence of outrageous press behavior distinguishes the present case from *Sheppard* v. *Maxwell*, 384 U.S. 333 (1966); *Estes* v. *Texas*, 381 U.S. 532 (1965); *Rideau* v. *Louisiana*, 373 U.S. 723 (1963); *Irvin* v. *Dowd*, 366 U.S. 717 (1961).

Defendant's reliance on articles reporting that defendant had confessed to the crime is not dispositive. "There is no statute, or rule of court, in this jurisdiction, prohibiting publication of confessions. . . ." *Hampton* v. *Commonwealth*, 190 Va. 531, 545, 58 S.E.2d 288, 293, *cert. denied*, 339 U.S. 989 (1950). Cases from other jurisdictions with a different view are not controlling here. In *Irvin* v. *Dowd*, *supra*, 366 U.S. at 725-27, the court considered a publicized confession as only one factor in determining whether pretrial publicity prejudiced defendant's right to a fair trial in the community.

There was a substantial time difference between the date of the crime, November of 1972 (when most of the press accounts appeared), and the date of the trial, June 13, 1973. On a change of venue motion, the court must look to the conditions at the time of the trial, not to the conditions at the time of the crime. *Rees* v. *Commonwealth*, 203 Va. 850, 859-62, 127 S.E.2d 406, 412-15 (1962); *Evans* v. *Commonwealth*, 161 Va. 992, 1003, 170 S.E. 756, 760 (1933).

Here, as in *Wansley* v. *Commonwealth*, 210 Va. 462, 171 S.E.2d 678 (1970),[2] the voir dire examination of the prospective jurors did not manifest any community or juror prejudice against the defendant. Of the thirty-seven prospective jurors, only fourteen were stricken for cause. Although almost all of the prospective jurors had heard about the case, few of them remembered the details. As was said in *Irvin* v. *Dowd*, *supra*, 366 U.S. at 722, jurors are not required to be "totally ignorant of the facts and issues involved [in a case]." The record shows that there was a thorough examination of the prospective jurors to ascertain whether any had formed or expressed any opinion as to the guilt or innocence of the defendant, whether he had any prejudice against him, and whether he could give him a fair trial based solely on the evidence introduced at the trial.

The record in the present case does not affirmatively show that the trial judge abused his discretion in holding that there was no "reasonable likelihood"[3] that the defendant would be prejudiced in his trial before a Charlottesville jury.

---

2. *See also sub nom.*, *Wansley* v. *Slayton*, 487 F.2d 90 (4th Cir. 1973).
3. *Sheppard* v. *Maxwell*, *supra*, 384 U.S. at 363.

■ Lastly, defendant contends that the trial judge erred in admitting into evidence some of his clothes, which were taken from him by the police while he was in custody. We do not agree.

The Charlottesville police had the right, without obtaining a search warrant, to seize defendant's clothing shortly after his arrest and confinement in the city jail, and to use the articles as evidence against him. The search and seizure did not violate the Fourth Amendment. *United States* v. *Edwards,* 415 U.S. 800, 94 S. Ct. 1234 (1974); *Carter* v. *Commonwealth,* 209 Va. 317, 322, 163 S.E.2d 589, 593 (1968), *cert. denied,* 394 U.S. 991 (1969); *Crowder* v. *Commonwealth,* 213 Va. 151, 153, 191 S.E.2d 239, 240 (1972).

For the reasons stated, the judgment of conviction and sentence is

*Affirmed.*