**STATE of Minnesota, Plaintiff,**

v.

**David Roy MACK, Defendant.**

**No. 50036.**

Supreme Court of Minnesota.

May 16, 1980.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Chief Asst. County Atty., Appellate Section, David W. Larson and Janice Symchych, Asst. County Attys., Minneapolis, for plaintiff.

William R. Kennedy, County Public Defender, David M. Duffy and James J. Krieger, Asst. County Public Defenders, and Beverly Wiechert, Minneapolis, for defendant.

Ephraim Margolin and Andrea L. Biren, San Francisco, Cal., for California Attorneys for Criminal Justice.

C. Paul Jones, Public Defender, and Michael F. Cromett, Asst. Public Defender, Minneapolis, for Minnesota Public Defenders.

Heard, considered, and decided by the court en banc.

WAHL, Justice.

Defendant, petitioner herein, is being prosecuted in Hennepin County District Court for criminal sexual conduct in the first degree in violation of Minn.Stat. § 609.342(e)(i) (1978), and for aggravated assault in violation of Minn.Stat. § 609.225, subd. 2 (1978). In the course of that prosecution, and before any determination of probable cause had been made, the district court certified to this court an important and doubtful question concerning the use of hypnotically-induced testimony in a criminal trial. It is a case of first impression. The precise question certified is whether a previously hypnotized witness may testify in a criminal proceeding concerning the subject matter adduced at the pretrial hypnotic interview.[1] Under the facts and circumstances of this case, and for the reasons set out below, we hold such testimony inadmissible.

Hypnosis, defined as a "highly suggestible state into which a willing subject is induced by a skilled therapist,"[2] has long been used as a psychotherapeutic tool. Its more recent and increasing use by police departments as an investigative tool and as a technique to produce evidence for criminal prosecutions[3] has given rise to scholarly and judicial concern and controversy.[4] We are presented in this appeal with a unique opportunity to examine in full the merits of that controversy. Excellent briefs, filed by the Hennepin County Public Defender and the Hennepin County Attorney for the parties and by amicus curiae Minnesota State Public Defender and California Attorneys for Criminal Justice, have aided us in our deliberations. Furthermore, the case need not turn, as have so many of the decided cases,[5] on an inadequate record. Five ex-

---

1. This question was certified to this court as important and doubtful and necessary to the resolution of the case, pursuant to Rule 29.02, subd. 4, Minn.R.Crim.P. All proceedings in the prosecution have been stayed pending resolution of this certified question.

2. J. Coleman, *Abnormal Psychology and Modern Life*, 579 (2d ed. 1960).

3. [As early as 1975] the Los Angeles Police Department began training detectives in the use of hypnosis in interrogation. This program, under the supervision of a psychologist, has been enthusiastically endorsed by the police officer students and has inspired interest in police departments across the country. Not only have police officers come to Los Angeles to obtain training, but lay hypnotists in several parts of the country have been engaged by police departments to provide "training" so that their detectives may utilize this modality in their work. Affidavit of Martin T. Orne, filed by *amicus curiae* California Attorneys for Criminal Justice, Petition for Certiorari, *People v. Quaglino,* Crim.No. 29766 (Cal.Ct.App., 2d Dist. 1977), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978) (hereinafter, Orne Affidavit).

4. *See Evidence—Admissibility of Present Recollection Restored by Hypnosis,* 15 Wake Forest L.Rev. 357 (1979); Annot., 92 A.L.R.3d 442 (1979); Woocher, *Did Your Eyes Deceive You?,* 29 Stan.L.Rev. 969 (1978); Spector and Foster, *Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible?,* 38 Ohio St.L. Rev. 567 (1977); Note, *Refreshing the Memory of a Witness through Hypnosis,* 5 UCLA—Alaska L.Rev. 266 (1976); C. McCormick, *Handbook of the Law of Evidence* § 208 (2d ed. 1972); Comment, *Hypnosis as a Defense Tactic,* 1 U.Toledo L.Rev. 691 (1969); Herman, *Use of Hypno-Induced Statements in Criminal Cases,* 25 Ohio St.L.J. 1 (1964); Teitlebaum, *Admissibility of Hypnotically Adduced Evidence,* 8 St.Louis U.L.J. 205 (1963); Orne, *Hypnotism, Suggestibility and the Law,* 31 Neb.L. Rev. 575 (1952). *Compare Harding v. State,* 5 Md.App. 230, 246 A.2d 302 (1968), *cert. denied,* 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978), and *United States v. Adams,* 581 F.2d 193 (9th Cir. 1978), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), *with State ex rel. Sheppard v. Koblentz,* 174 Ohio St. 120, 187 N.E.2d 40 (1962) and *Greenfield v. Commonwealth,* 214 Va. 710, 204 S.E.2d 414 (1974).

5. *See* Dilloff, *The Admissibility of Hypnotically Influenced Testimony,* 4 Ohio N.U.L.Rev. 1, 18–20 (1977), criticizing *Harding v. State,* 5 Md. App. 230, 246 A.2d 302 (1968), *cert. denied,* 395 U.S. 949 (1969).

perts on hypnosis and memory retrieval testified at the omnibus hearing in the court below: Dr. Carl Malmquist, a practicing psychiatrist and consultant to the Hennepin County District Court; Dr. Allan Roberts, a clinical psychologist at Mayo Clinic who uses hypnosis in therapy and has taught clinical and experimental courses on hypnosis at the University of Minnesota for over ten years; Dr. Charles Mutter, a court psychiatrist from Dade County, Florida; Dr. Leo Alexander, a Boston psychiatrist who has been practicing since 1929 and uses hypnosis almost every day for therapeutic purposes; and Dr. Martin T. Orne. Dr. Orne is both a psychiatrist and a psychologist, heads the major hypnosis research laboratory in the country at the University of Pennsylvania, and is editor-in-chief of the Journal of Clinical and Experimental Hypnosis.[6] The valuable testimony of these expert witnesses provides an extensive record upon which the legal issue before us may be decided. An examination of their testimony also demonstrates the truth of Dr. Orne's observation that a case-by-case decision on the admissibility question would be prohibitively expensive, and reveals the difficulty of getting experts qualified to testify about hypnosis as an investigative rather than a therapeutic tool.

This case did not arise and cannot be decided in a vacuum. Because no trial has been held and no probable cause determination made, the following facts bearing on the admissibility of the challenged evidence have been taken from the police file and hospital record.

At 2:19 a. m. on May 14, 1978, Marion J. Erickson was brought by ambulance from the Hi Lo Motel in Minneapolis to the Hennepin County Medical Center, bleeding profusely from her vagina. Defendant, who had met and danced with Ms. Erickson at the Spring Inn bar the evening before and had taken her to the motel on his motorcycle afterwards, had telephoned for an ambulance and told the ambulance drivers that he and Ms. Erickson "were engaged in sexual intercourse when she started bleeding." One of the drivers observed that Ms. Erickson was "quite drunk" and that her speech was unclear; she had difficulty walking but did walk from the motel room to the ambulance with defendant's assistance and insisted that "it wasn't [defendant's] fault." The other driver stated that defendant "seemed very concerned," and that Ms. Erickson refused to give her name but asked defendant to go with her to the hospital.

At Hennepin County Medical Center Emergency Department, Ms. Erickson was attended by one intern who noted that she was in a "flat emotional state" and recorded that she told him she had been "engaged in sexual activity with fingers being placed in her vagina." Another intern who assisted in Ms. Erickson's treatment stated that she was suffering from a cut through the vaginal tissue into a muscle layer and that she believed she had been injured in a motorcycle accident. It was this intern's opinion that the injury could not have occurred during intercourse and that, because of its length and depth, it could not have been caused by a human fingernail. He said this type of injury could be the result of "tearing after childbirth."

After Ms. Erickson had been advised by the doctors concerning the nature of her injury and had been told by them that they did not believe she had been involved in a motorcycle accident, Ms. Erickson telephoned police on May 16 to report an assault. She told police she could remember nothing after the motorcycle accident until she awoke at the motel, bleeding from her vagina and lying in a pool of blood on the bed. She remembered saying, "David, don't leave me" and hearing someone assure her that he would not. She indicated that she had been suffering emotional problems, due to a serious relationship with a man that had recently ended, and that she had "blacked out" from drinking on other occasions.

---

**6.** Dr. Orne authored the *Encyclopedia Britannica* entry on "Hypnosis" and the Orne Affidavit noted in footnote 3 herein, both of which were received in evidence in the case before us. (In *Quaglino*, the Supreme Court denied certiorari but granted Dr. Orne's motion to file an *amicus* brief.

Lieutenant Dennis Weiss of the Minneapolis Police Department began investigating the case on May 17. He spoke to defendant, to the doctors at the hospital, and to defendant's ex-wife. With the information he gathered, and with Marion Erickson's consent, Lieutenant Weiss made an appointment for June 26, some six weeks after the alleged assault, with Beauford Kleidon, a self-taught lay hypnotist in Roseville, Minnesota. Kleidon testified at the omnibus hearing that he does not solicit police investigatory business and that before the appointment he knew only that Weiss had a witness with a memory block who had been hospitalized with a cut in her vagina. Weiss and Sergeant Roach, who had accompanied Ms. Erickson to Kleidon's office, left the room for 45 minutes. During this time, Kleidon tested Ms. Erickson's hypnotic susceptibility with several standard tests, induced hypnosis with a standard fixation procedure, and, when he had determined that she had entered a deep hypnotic state, asked her permission for Weiss and Roach to enter the room. Ms. Erickson agreed, and the policemen entered and made an audio tape recording of the portion of the hypnotic session which followed. This tape itself has been lost. A transcript, typed by the police stenographer, was received in evidence as State's Exhibit C.

The transcript reveals that Beauford Kleidon told Ms. Erickson that she would remember the events of May 13 and 14 as they actually occurred, but as though on a television screen and without emotion. Under hypnosis, Ms. Erickson reported that at the Hi Lo Motel David Mack "told me to get on the bed and take my clothes off. He said, 'I want to get even with you for running out on me.'" As the hypnotist assured her, "[y]ou will see it very plainly in your mind," but "you feel nothing," Ms. Erickson said, "oh, no, no, no * * *. He told me to spread my legs, * * *. He pulled out this switchblade and told me he was going to kill me * * * he kept sticking this knife up me and I remember screaming and screaming."

At the close of the session, Kleidon made the following statement, referred to at the hearing and in the briefs as a "post-hypnotic suggestion": "You are going to feel as if your body and your mind have been completely rejuvenized [sic] and you will be able to remember very clearly everything that has happened on the 13th and 14th. Now that memory is very clear in your mind. This does not disturb you."

The following day, Marion Erickson went to the police department and gave Lieutenant Weiss a typewritten statement recounting as her present memory the events of May 13, as she had reported them under hypnosis. On July 26, 1978, a complaint was issued, and David Mack was arrested on October 5, 1978.

The only issue before us is the admissibility of Marion Erickson's hypnotically-induced testimony. Defendant argues that her hypnotically-induced "memory" of the alleged assault is not sufficiently reliable to merit admission and that permitting her to testify to this memory under the circumstances of this case would deny him his right to confrontation and to cross-examination under the Sixth and Fourteenth Amendments. The state argues that Erickson's testimony is admissible as "present recollection refreshed" and should be admitted as long as certain safeguards can be established.

Defendant urges that the doubtful reliability of hypnosis-prompted recollection raises an admissibility question which is governed by the standards announced in *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923). In *Frye*, the court ruled inadmissible the results of a "deception test," an early version of today's polygraph, articulating the following standard for admissibility of the results of a scientific technique: Although expert testimony deduced from the scientific discovery is admissible under far less stringent circumstances, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. at 1014. Since 1952, this court has relied on *Frye* in repeatedly ruling inadmissible the results of

polygraph tests.[7] *State v. Kolander*, 236 Minn. 209, 220–21, 52 N.W.2d 458, 464–65 (1952); *State v. Goblirsch*, 309 Minn. 401, 246 N.W.2d 12 (1976); *State v. Hill*, 312 Minn. 514, 253 N.W.2d 378 (1977); *State v. Wakefield*, 263 N.W.2d 76 (Minn.1978). In *State ex rel. Trimble v. Hedman*, 291 Minn. 442, 192 N.W.2d 432 (1971), this court held that spectograph results, or "voiceprints" meet the standard of scientific reliability necessary for admissibility under *Frye*.

Focus on the scientific reliability of hypnosis-induced evidence was suggested in *People v. Harper*, 111 Ill.App.2d 204, 250 N.E.2d 5 (1969). There, the court, holding that testimony induced by truth serum is inadmissible, stated:

> We see no reason to equate examination under hypnosis and examination while under the influence of a drug having the effect of a "truth serum" except to note that the scientific reliability of neither is sufficient to justify the use of test results of either in the serious business of criminal prosecution. 111 Ill. App.2d at 209, 250 N.E.2d at 7.

In *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974), the court, utilizing a *Frye* analysis, ruled hypnotic evidence not admissible in a criminal prosecution.

Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. Although hypnotically-adduced "memory" is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context, where the best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or con-

fabulation—a filling of gaps with fantasy. Such results are not scientifically reliable as accurate.

The testimony of the five experts at the omnibus hearing went primarily to the content of a "memory" "revived" by hypnosis. The experts agreed initially that hypnosis is capable of releasing an emotional memory "block,"[8] and that historically valid memory can result from hypnotic recall.[9] Hypnosis is used by trained psychiatrists and psychologists as a therapeutic tool. Several of the experts noted that for it to be therapeutically useful, it need not produce historically accurate memory. Thus, the historical or scientific accuracy of the memory adduced under hypnosis is not an ordinary subject of investigation or concern by its practitioners in the medical and psychological community.

Expert testimony further indicated that a hypnotized subject is highly susceptible to suggestion, even that which is subtle and unintended. Such suggestion may be transmitted either during the hypnotic session or before it by such individuals as, in this case, the doctors, who believed the wound was caused by a sharp instrument, and the policemen investigating the incident, who undoubtedly entertained their own theories regarding the cause of the injury. The hypnotized subject is influenced by a need to "fill gaps." When asked a question under hypnosis, rarely will he or she respond, "I don't know." Another factor, significant for this case, which can affect the "memory" produced under hypnosis is the subject's desire to please either the hypnotist or others who have asked the person hypnotized to remember and who have urged that it is important that he or she remember certain events. Most significantly, there is no way to determine from the content of the

---

7. It is interesting to note Dr. Orne's testimony that, in his opinion, a witness' testimony to a "memory" retrieved under hypnosis is "infinitely less reliable" as an indicator of truth than the results of a polygraph test.

8. Dr. Roberts testified that hypnosis would be of little value in retrieving an alcohol-produced memory "loss."

9. According to Dr. Martin Orne, however, a suggestion like the one made to Marion Erickson, that she feel no emotion during the hypnotic session, is likely to result in less accurate recall.

"memory" itself which parts of it are historically accurate, which are entirely fanciful, and which are lies.

In addition to its historical unreliability, a "memory" produced under hypnosis becomes hardened in the subject's mind. A witness who was unclear about his "story" before the hypnotic session becomes convinced of the absolute truth of the account he made while under hypnosis.[10] This conviction is so firm that the ordinary "indicia of reliability" are completely erased, and hypnotic subjects have been able to pass lie detector tests while attesting to the truth of statements they made under hypnosis which researchers know to be utterly false. It would be impossible to cross-examine such a witness in any meaningful way. Such firm subjective conviction as could easily fool a juror is even more likely to result from a situation where the subject has been given a post-hypnotic suggestion like the one in this case: "You will remember very clearly everything that has happened on the 13th and 14th." Two of the experts testifying were convinced that such a suggestion would assure that the hypnotized person would remember what she had related under hypnosis as a memory of the events in question themselves. The subject's conviction of the truth of the "memory" could last indefinitely.

The state urges us to follow the lead of courts which have held that the fact that a witness was previously hypnotized to recall the subject matter of her testimony affects credibility, not admissibility. The state cites *United States v. Narciso,* 446 F.Supp. 252 (E.D.Mich.1977), where, after hearing Dr. Orne's opinion that the "recall" of an elderly alcoholic patient, hypnotized after stating that he had no memory of the events in issue, was the product of suggestion, the court ruled the patient's testimony admissible, distinguishing the question of scientific validity from legal credibility. 446 F.Supp. at 282. The court in *State v. McQueen,* 295 N.C. 96, 244 S.E.2d 414 (1978) drew the same distinction. There, a few weeks before the appellant's murder trial, conducted more than five years after the killings, the prosecution's only eyewitness was hypnotized at her own request to refresh her memory of the events. The court held that hypnosis affected only the credibility and not the admissibility of her testimony.

The state argues that the *Frye* test is inapplicable in the case before us, where the proffered evidence does not consist of the results of a mechanical device, such as a polygraph, but of testimony from human recall. The testimony of the previously hypnotized witness need not be truthful in order to be admissible, the argument goes; it need only be based on "what the witness actually saw or experienced, as opposed to suggestion." However, the fact that a witness' memory results from hypnosis bears on the question of whether her testimony is sufficiently competent, relevant, and more probative than prejudicial, to merit admission at all. The crux of the problem is that hypnosis can create a memory of perceptions which neither were nor could have been made, and, therefore, can bring forth a "memory" from someone who cannot establish that she perceived the events she asserts to remember.[11] Neither the person hypnotized nor the expert observer can distinguish between confabulation and accurate recall in any particular instance. After the hypnosis session, the hypnotically

---

**10.** Dr. Orne testified that he has seen an increasing use of hypnosis by the police to create more trustworthy witnesses:

> I've seen now several cases where this seemed to have happened * * *
>
> Typically, when a witness is a bad witness * * * you hypnotize [him] because * * —the story goes all over the place every time he's asked something different—once you hypnotize [him], he consensually validates the story, and at that point it's fixed * * * you can take somebody who is a terribly bad

witness and make [him] a very good witness, because you * * * convinced [him] not only of the reality, but that you believe in the reality, and as a consequence [he] become[s] [an] unshakeable witness[ ] and that is a profound danger.

**11.** It is not clear from the record before us that Ms. Erickson was not so drunk that she could not have remembered what had happened under any circumstances.

"retrieved" account differs in another way from ordinary human recall, to which the state seeks to liken it. Because the person hypnotized is subjectively convinced of the veracity of the "memory," this recall is not susceptible to attack by cross-examination.

Formulating an admissibility rule which is sensitive to this reliability problem raises enormous difficulties. A review of the existing case law is not enlightening, perhaps because, as one *amicus* observed, many of these cases turned on inadequate records, due to the difficulty and expense of calling experts qualified to testify to the uses of hypnosis as an investigative tool.[12] Early decisions held flatly that "hypnosis has no place in the law." *People v. Ebanks*, 117 Cal. 652, 49 P. 1049 (1897). *See State v. Pusch*, 77 N.D. 860, 46 N.W.2d 508 (1950).

There is today a tendency toward more liberal admission of testimony resulting in some way from hypnosis. It is significant, however, that this tendency clearly favors only the prosecution of criminal matters:

> In many of the reported cases in point, the accused was endeavoring to present to the jury hypnotic evidence of innocence; however, in others it was the prosecution which sought to place on the witness stand an individual whose testimony would be incriminating, but whose memory of the crimes had partially lapsed because of the passage of time, the consumption of drugs, or the trauma of being the victim of the unlawful events leading to the trial itself. While in the former instances the accused generally argued to little or no avail for the admissibility of the evidence, in the latter the defendant was unsuccessful in attempting to block introduction of the testimony.

Annot., 92 A.L.R.3d 442, 446–47 (1979). The results of favoring hypnotically-induced testimony by prosecution witnesses but not by the accused are, as might be predicted, "no error" holdings; convictions are affirmed.

Courts have been particularly willing to admit the hypnotically-induced testimony of a prosecution witness who was a victim of the crime. Such testimony has been called "the most dramatic and dangerous use of hypnosis in the legal sphere." Dilloff, *The Admissibility of Hypnotically Influenced Testimony*, 4 Ohio N.U.L.Rev. 1, 18 (1977). As an illustration of the dangers, the commentator cites *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969), where, on facts similar to the ones presented here, the court held it was not error for the trial court to hear testimony by the prosecutrix whose memory of the sexual assault charged was "refreshed" by hypnosis performed at a police station one month after the incident.

In *Harding*, the court assumed that because the victim stated that she was testifying from her own independent recollection, and because the hypnotist stated that he made no suggestions, the evidence was both accurate and reliable.[13] However, the hypnotist was employed by the police and performed the hypnosis at police barracks. The victim was aware that the primary purpose of the hypnosis was to enable her to recall the identity of her assailant. The defendant had already been arrested. "It seems apparent that there was a strong desire on the part of all concerned * * * to confirm their arrest by having the victim identify the suspect." Dilloff concludes: "[I]t appears that the court may have fallen into the major trap to which the authorities call attention: the fact that because the victim appeared to be both *convincing* and

---

12. Although the CACJ was evidently laboring under the false impression that hypnosis was used in this case to *identify* the accused, its arguments about the potential for abuse in the use of hypnotically-adduced evidence are applicable in this case.

13. The court's assumption confirms Dr. Orne's observation in his *Quaglino* affidavit "that a jury or even a judge unfamiliar with the dramatic impact of the hypnotic phenomenon may easily be unduly influenced and may, therefore, give inappropriately great weight to the material brought forth under hypnosis—even if it is explained that this material is not historically accurate."

*convinced* of the accuracy of her story, the court also became convinced." 4 Ohio N.U. L.Rev. at 19, 20.

In *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974), where the defendant in a murder trial sought admission of his psychiatrist's testimony that defendant made exculpatory statements during a hypnotic session, the court refused to follow *Harding.* The court stated: "Most experts agree that hypnotic evidence is unreliable because a person under hypnosis can manufacture or invent false statements. * * * A person under a hypnotic trance is also subject to heightened suggestibility." 214 Va. at 715, 204 S.E.2d at 419.

We recognize that there are two lines of cases regarding the admissibility of hypnotically-induced evidence: one line of cases where the exculpatory hypnotically-induced testimony of criminal defendants was excluded, and the other line of cases where the hypnotically-induced testimony of prosecution witnesses was admitted. *Compare Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969) *with Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974). We follow the best scientific authority, however, in rejecting as artificial and unprincipled any distinction between hypnotically-induced testimony offered by the defense to exculpate and that offered by the prosecution to make its case. Regardless of whether such evidence is offered by the defense or by the prosecution, a witness whose memory has been "revived" under hypnosis ordinarily must not be permitted to testify in a criminal proceeding to matters which he or she "remembered" under hypnosis.

We do not foreclose, by this opinion, the use of hypnosis as an extremely useful investigative tool when a witness is enabled to remember verifiable factual information which provides new leads to the solution of a crime. A witness under hypnosis may, for instance, bring forth information previously unknown to law enforcement authorities, such as a license plate number, which subsequently aids police in identification of a suspect. Experts see no reasonable objection to the use of hypnosis in this manner, provided the witness is willing, as long as the material remembered during hypnosis is not subsequently used in court as part of an eyewitness' testimony. Even where the use of hypnosis truly is to investigate a crime rather than to create a witness, adequate safeguards should be established to assure the utmost freedom from suggestion upon the hypnotized person's memory recall in the event he or she must later be called to testify to recollections recorded before the hypnotic interview.[14]

14. We note, without adopting, the following safeguards recommended by the Orne Affidavit:

A. Hypnosis should be carried out by a psychiatrist or psychologist with special training in its use. He should not be informed about the facts of the case verbally; rather, he should receive a written memorandum outlining whatever facts he is to know, carefully avoiding any other communications which might affect his opinion. Thus, his beliefs and possible bias can be evaluated. It is extremely undesirable to have the individual conducting the hypnotic sessions to have any involvement in the investigation of the case. Further he should be an independent professional not responsible to the prosecution or the investigators.

B. All contact of the psychiatrist with the individual to be hypnotized should be video taped from the moment they meet until the entire interaction is completed. The casual comments which are passed before or after hypnosis are every bit as important to get on tape as the hypnotic session itself. (It is possible to give suggestions prior to the induction of hypnosis which will act as posthypnotic suggestions.)

Prior to the induction of hypnosis, a brief evaluation of the patient should be carried out and the psychiatrist should then elicit a detailed description of the facts as the witness or victim remembers them. This is important because individuals often are able to recall a good deal more while talking to a psychiatrist than when they are with an investigator, and it is important to have a record of what the witness's beliefs are before hypnosis. Only after this has been completed should the hypnotic session be initiated. The psychiatrist should strive to avoid adding any new elements to the witness's description of his experiences, including those which he had discussed in his wake state, lest he inadvertently alter the nature of the witness's memories—or constrain them by reminding him of his waking memories.

The circumstances presented by the case before us are most suspect. Hypnosis of Ms. Erickson was not necessary to assist the prosecution in identifying the defendant, who was the only person in the motel room with her when she was injured. Beauford Kleidon, the hypnotist, has no formal education and no scientific understanding of the human memory or of the operation of suggestion in hypnosis. Furthermore, he was hired by the police, whose interest in the outcome of the hypnotic session might well have been communicated to Ms. Erickson. These interested parties, but no representative of the defendant, were, in fact, present at the hypnotic session, possibly cuing Ms. Erickson's memory by their facial expressions and gestures. The hypnotic session itself took place several weeks after the incident which Ms. Erickson sought to recall, during which time she undoubtedly spoke to the physicians who treated her and entertained their own hypotheses regarding the origins of the injury, as well as to the police and her friends.

Finally, there was no real corroboration after the hypnosis session of any "facts" which Ms. Erickson recalled for the first time under hypnosis and which were previously unknown to the authorities. Although Ms. Erickson recalls the assault upon her as one of repeated stabbings, her hospital records indicate she had only a single deep cut inside her vagina and no injury to the labia or perineum. She described Mack's motorcycle as a black Yamaha, and stated that earlier in the day she had eaten lunch with her father at the Embers restaurant and had ordered pizza. However, defendant drove a maroon Triumph. Embers restaurants do not serve pizza. The day following hypnosis, Ms. Erickson remembered for the first time that she had met David Mack previously at the Spring Inn with a friend of hers, Hazel Durkin, that she had danced with him, and that she and Hazel had sneaked away from David Mack and his companion, facts which would seem to explain her memory that during the assault defendant told her, "I want to get even with you for running out on me." On July 21, over three weeks after the hypnotic session, Lieutenant Weiss spoke to Hazel Durkin, who recalled being with Ms. Erickson one evening in May at the Spring Inn, when the two women had met and slipped away from two men named Larry and Dave. Ms. Durkin described the man named "Dave" as being "around" 5' 1", having long, reddish-brown hair, and having a tattoo on his left arm. David Mack is 5' 8" and has no tattoos on either arm.

 These circumstances support our holding that testimony of this previously hypnotized witness concerning the subject matter adduced at the pretrial hypnotic interview may not be admitted in a criminal proceeding. In so holding, we make no decision regarding the existence of probable cause to prosecute David Roy Mack, and remand this case to the Hennepin County District Court for that determination.

Because we hold that the proffered testimony does not meet ordinary standards of reliability for admission, we need not reach defendant's constitutional challenges.

Remanded for further proceedings not inconsistent with this opinion.

C. No other than the psychiatrist and the individual to be hypnotized should be present in the room before and during the hypnotic session. This is important because it is all too easy for observers to inadvertently communicate to the subject what they expect, what they are startled by, or what they are disappointed by. If either the prosecution or the defense wish to observe the hypnotic session, they may do so without jeopardizing the integrity of the session through a one-way screen or on a television monitor.

D. Because the interactions which have preceded the hypnotic session may well have a profound effect on the sessions themselves, tape recordings of prior interrogations are important to document that a witness had not been implicitly or explicitly cued pertaining to certain information which might then be reported for apparently the first time by the witness during hypnosis.