STATE OF NEBRASKA, APPELLEE, V.
CHARLES JESS PALMER, ALSO KNOWN AS
CHARLES TINSLEY, ALSO KNOWN AS
J. R. KIRKPATRICK, APPELLANT.

313 N.W.2d 648

Filed December 18, 1981.   No. 43708.

John A. Wolf and Jerry J. Milner for appellant.

Paul L. Douglas, Attorney General, and J. Kirk Brown for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

McCOWN, J.

The defendant was found guilty by a jury on a charge of murder in the perpetration of a robbery. Following a sentencing hearing, a three-judge panel imposed the death penalty.

Eugene Zimmerman operated a coin shop located on the first floor of his residence in Grand Island, Nebraska. On March 6, 1979, at approximately 5 p.m., Zimmerman's wife, Monica, returned to the house and discovered that the coin shop had been looted and her husband was missing from the shop. She called the police who arrived in 2 or 3 minutes. Eugene Zimmerman's body was found in an upstairs bedroom. He had been strangled with an electric cord. Cash, coins, jewelry, and other items were missing from the coin shop and from the residential portions of the house, including jewelry the victim had been wearing. The time of death was later established as approximately 4:30 p.m.

On March 22, 1979, Jesse Garza, a coin dealer in Austin, Texas, purchased a number of gold and silver coins and pieces of antique jewelry from a man who represented himself to be a visitor in Austin. On March 27, 1979, Garza read an article in a trade journal which reported Zimmerman's death, identified

many of the articles which had been stolen, and requested coin dealers to be on the lookout for the stolen items. The items Garza had purchased on March 22nd appeared to be some of the items described in the article. He contacted the Austin, Texas, police department at approximately 2 p.m., reported his information, and was told to stall the person from whom he had purchased the items if he was contacted again. The police began an immediate investigation, interviewed Garza at his shop, verified the information, and returned to the police station at about 3:30 p.m.

Later in the afternoon of March 27th the man telephoned Garza seeking to sell more items, and he and Garza arranged to meet at the Austin airport. Garza again contacted the police at approximately 4:45 p.m., and the police accompanied him to the airport where the defendant was arrested at approximately 6 p.m. Various items in the defendant's possession at the airport were seized. Those items, as well as the items sold to Garza on March 22, 1979, were identified as having been taken from the Zimmerman house.

At trial Deanna Klintworth testified that at approximately 4:30 p.m. on March 6, 1979, as she and her husband drove past the Zimmerman house in Grand Island, Nebraska, she saw a tall man and a woman walking away from the house. The man was carrying a baby. She was unable to recall any further details.

Jim Mracek, the manager of a 7-Eleven store across the street from the Zimmerman residence, testified that on March 6, 1979, he saw Zimmerman in the Mracek store with a man, woman, and baby. Mracek testified that the man with Zimmerman was not the defendant. Initially he identified Cherie Palmer, the defendant's wife, as the woman, but later testified that he was unable to state that she was the woman he saw in his store on March 6, 1979. Zimmerman and the couple did not come into the store together. The couple drove a dark sedan with out-of-state plates.

Monica Zimmerman testified that the defendant,

his wife, and baby had been at the Zimmerman house on several occasions prior to March 6, 1979, to transact business with Eugene Zimmerman. On these occasions either the defendant or his wife had sold coins or other objects to Zimmerman. The last time she saw the three at the Zimmerman house was on Friday evening, March 2, 1979, at which time Cherie Palmer was offering five gold rings for sale. Monica Zimmerman also identified a pickup truck driven by the defendant at the time of his visits to the Zimmerman residence. She also described the physical layout of the Zimmerman residence and the physical arrangements in the area used for the coin business. She described and identified the items missing from the Zimmerman home on the day of the murder, as well as the sequence of events leading to the discovery of her husband's body.

The State's evidence showed that a "C. Palmer" was issued an equipment violation ticket in the early afternoon of March 6, 1979, at a highway intersection 9 miles south of Hastings, Nebraska, at a State Patrol equipment check point. Neither a ticket nor a copy was produced and the trooper could neither identify anyone to whom he had issued a ticket nor state in which direction the vehicle was traveling. The intersection was at a point approximately halfway between Grand Island, Nebraska, and Guide Rock, Nebraska, where the defendant was living at the time.

The defendant and his wife had lived in Guide Rock, Nebraska, since August 1977. Their baby was born July 4, 1978. The defendant was employed at a dog farm in Guide Rock. The owners were vacationing in Florida during February and March of 1979, but conversed with the defendant periodically by telephone. The defendant called them the last time on March 18, 1979. On March 19, 1979, the defendant arranged with a neighbor to take care of the dogs and the defendant and his family left Guide Rock on March 19 or 20, 1979.

The defendant did not testify at the trial and the jury

was appropriately instructed regarding that fact. The jury found the defendant guilty and a three-judge panel imposed a death sentence. This appeal followed.

Prior to trial the defendant filed a motion to suppress the items seized from the defendant's person at the time of his arrest. Defendant also filed a motion and amended motion in limine to suppress all testimony from Monica Zimmerman, Deanna Klintworth, and Jim Mracek upon the ground that their testimony was obtained by the State under hypnosis at a pretrial hypnotic interview. The trial court, after hearings, denied the motion to suppress evidence. The court also denied the motion to exclude the testimony of hypnotized witnesses, except that the court did exclude any testimony given while under hypnosis by the three witnesses. The District Court's rulings on those motions constituted the basic assignments of error on this appeal.

The defendant contends that his arrest in Texas without a warrant was unlawful under the law of Texas, and consequently the items seized from him at the time of his arrest are inadmissible. The State contends that Nebraska law applies to the arrest; that under Nebraska law the arrest was lawful; and that in any event the District Court was correct in holding that a valid warrantless arrest was made.

The District Court found that a valid warrantless arrest was made under the laws of Texas and the necessary exigent circumstances existed, and overruled the motion to suppress.

*State v. Wilson*, 199 Neb. 765, 261 N.W.2d 376 (1978), is dispositive of the issue as to whether the law of Texas or of Nebraska is to be applied to determine the validity of the arrest. That case held that the legality of an arrest is, within constitutional limits, governed by the law of the state where the arrest takes place. In the case now before us the statutory law of Texas was properly introduced into evidence and the substantive law of Texas was properly applied by the

District Court.

The defendant does not dispute the fact that the Texas police officers had probable cause for the arrest by 3:30 p.m. on March 27, 1979, after they had interviewed Garza, examined and identified the items purchased by Garza from the defendant, and had verified additional information as to the murder of Zimmerman and the robbery in Grand Island, Nebraska, by telephone to the Grand Island Police Department. When Garza again telephoned the Texas police at approximately 4:30 p.m. and told them of the planned meeting with the defendant at the airport, they left the police station approximately 20 minutes later and accompanied Garza to the airport where the arrest followed. The defendant now contends that the police had ample time to obtain an arrest warrant and that none of the statutory exceptions to the requirement of a warrant applied.

Texas statutes dealing with an arrest without a warrant contain specific provisions authorizing warrantless arrests under certain circumstances. See, Tex. Code Crim. Proc. Ann. art. 14.01 through 14.04 (Vernon 1977). Article 14.01 authorizes a peace officer to arrest an offender without a warrant for any offense committed in his presence or within his view. Article 14.04 provides that where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused.

Under the circumstances reflected by this record it is quite clear that the police officers had probable cause for arrest of the defendant but did not know his whereabouts at the time, except that he was meeting Garza at the airport. They not only had probable cause to arrest him for a prior crime or crimes, but they had probable cause to believe that he would have stolen

property on his person at the time of arrest. Although there may have been some question as to whether there was sufficient time to procure a warrant, a meeting at an airport indicates the possibility of immediate flight. There can be no question that the defendant was in possession of stolen property at the time of his arrest, however, and that that offense was committed in the presence of the officers.

Even if the statutory exceptions in article 14 were inapplicable, the arrest under Texas law was also validated under Tex. Code Crim. Proc. Ann. art. 18.16 (Vernon 1977). That section provides: "All persons have a right to prevent the consequences of theft by seizing any personal property which has been stolen and bringing it, with the supposed offender, if he can be taken, before a magistrate for examination, or delivering the same to a peace officer for that purpose. To justify such seizure, there must, however, be reasonable ground to suppose the property to be stolen, and the seizure must be openly made and the proceedings had without delay." Under that statute the Texas court has held that an officer must have probable cause to arrest under the statute but that no warrant need be obtained. See *Lewis v. State*, 598 S.W.2d 280 (Tex. Crim. App. 1980).

In the case at bar the evidence establishes, and the defendant does not contest, that the officers had probable cause to arrest the defendant. A valid warrantless arrest was made under the laws of Texas, and the District Court properly overruled the motion to suppress the evidence seized from the person of the defendant at the time of the arrest.

The defendant contends that the District Court erred in overruling defendant's motion in limine to suppress oral proffered testimony from Monica Zimmerman, Deanna Klintworth, and Jim Mracek, witnesses endorsed by the State. The grounds for the motion were that the State had placed the witnesses under hypnosis subsequent to the murder of Eugene Zimmerman;

that the party or parties placing the witnesses under hypnosis lacked sufficient qualifications and adequate training to conduct hypnosis; that by the hypnosis the witnesses were subjected to heightened suggestibility which tends to induce the witness to engage in fanciful, exaggerated, or incorrect versions of the facts; and that because of the hypnosis it is impossible to determine whether the witnesses' proferred testimony will be based on independent recollection of facts or is a product of and created by the hypnotic sessions conducted by the State. The final ground for the motion in limine was that hypnosis has not attained sufficient scientific and psychological accuracy for general recognition as being capable of definite and certain interpretation as to justify the admission of the testimony of the witnesses.

The District Court overruled the motion in limine, except that the court excluded any testimony given while under hypnosis by the three witnesses named in the motion in limine. At no time did anyone take a recorded or sworn statement as to what facts these three witnesses recalled prior to the hypnosis, and the hypnotic interviews took place from 3 to 6 days after the murder. However, a record was made of each of the three hypnotic sessions. The hypnotic session with Monica Zimmerman was conducted by Larry E. Williams, a criminal investigator for the Nebraska State Patrol. The hypnotic sessions with Deanna Klintworth · and Jim Mracek were conducted by Blake Scott, an instructor at the Law Enforcement Training Center of the Nebraska State Patrol. Neither of the hypnotists had had any professional medical, psychiatric, or psychological education or training.

Williams' training in hypnosis consisted of a 4-day course in January 1979. He had conducted hypnotic sessions with approximately 20 different subjects, most of them classmates during his training session. The session with Monica Zimmerman was the third session he had conducted outside of class.

Scott's training in hypnosis consisted of the same 4-day course in January 1979. He had conducted hypnotic sessions approximately 70 times, virtually all of which were in classes. The hypnotic session he had with Deanna Klintworth was the second hypnotic session he had conducted in a criminal case.

The only information Williams and Scott had prior to the hypnotic sessions was received from police officers, and no statement was obtained by the hypnotists from the subjects prior to the hypnosis. A psychiatrist who had specialized in hypnosis for 20 years testified as an expert witness for the defendant at the hearing on the motion. He testified that there is a specific danger in hypnosis of an interviewer implanting suggestions in the subject's mind that become fixed so that the subject believes them to be true after hypnosis. He also testified that the interviewers' questions in specific areas of both the Zimmerman and Klintworth sessions were improperly suggestive. The trial court refused to permit the doctor to give his opinion as to whether the testimony of the witnesses at trial was suspect and unreliable.

The case at bar is a case of first impression in this jurisdiction as to the admissibility of the testimony of a previously hypnotized witness in a criminal proceeding concerning subject matter adduced at the pretrial hypnotic interview. The authorities agree that the problem is that hypnosis can create a memory of perceptions which did not previously exist and therefore bring forth a "memory" of events which were nonexistent but which may become fixed in the patient's mind so that he believes them to be true after hypnosis. Neither the person hypnotized nor an expert observer can distinguish between "confabulation" and accurate recall in any particular instance. Because the hypnotized subject is subjectively convinced of the veracity of the "memory," his recall is reinforced and virtually immune to attack by cross-examination.

In the past courts generally held that hypnosis affected only the credibility and not the admissibility of the witness' testimony. There were two lines of cases regarding hypnotically induced evidence. One line of cases excluded from evidence the exculpatory hypnotically induced testimony of criminal defendants and the other line of cases admitted the hypnotically induced testimony of prosecution witnesses. See, *Harding v. State*, 5 Md. App. 230, 246 A.2d 302 (1968), *cert. denied* 395 U.S. 949, 89 S. Ct. 2030, 23 L. Ed. 2d 468 (1969); *Greenfield v. Commonwealth*, 214 Va. 710, 204 S.E.2d 414 (1974). It is difficult to find any common thread in the prior cases dealing with the subject and difficult to find any logical basis for the distinctions made in the two lines of cases.

Recently, three cases have been decided which have developed different standards of admissibility for hypnotically induced evidence. In May 1980 the Supreme Court of Minnesota decided the case of *State v. Mack*, 292 N.W.2d 764 (Minn. 1980). The Minnesota court held that the results of hypnosis used to produce hypnotically induced "memory," like the results of mechanical or scientific testing, are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. The court held that as to hypnosis used to retrieve memory the results are not yet scientifically reliable as accurate. The court held that a previously hypnotized witness could not testify in a criminal proceeding concerning subject matter adduced at a pretrial hypnotic interview.

In February 1981 the Supreme Court of Arizona decided the case of *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981). The Arizona court held that until hypnosis gains acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion, or fantasy, testimony of witnesses

who have been questioned under hypnosis regarding the subject matter of their offered testimony is inadmissible in criminal trials.

In July 1981 the Supreme Court of New Jersey decided the case of *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981). The New Jersey court held that hypnosis when used to restore a witness' memory can be considered reasonably reliable if it is able to yield recollections as accurate as those of an ordinary witness which likewise are often historically inaccurate. Hypnotically induced testimony may be admissible if the proponent of the testimony can demonstrate that the use of hypnosis in the particular case was a reasonably reliable means of restoring memory comparable to normal recall in its accuracy. The party seeking to introduce hypnotically refreshed testimony has the burden of establishing its admissibility by clear and convincing evidence. If testimony enhanced through hypnosis is admissible, the opponent may still challenge the reliability of the particular procedures followed in the individual case by introducing expert testimony at trial, but may not attempt to prove the general unreliability of hypnosis. The New Jersey court also held that in reviewing admissibility of hypnotically refreshed testimony, the trial court should evaluate the kind of memory loss that hypnosis was used to restore and the specific technique employed, based on expert testimony presented by the parties. The court also laid down specific requirements which must be met before a party may introduce hypnotically refreshed testimony in a criminal trial. Those requirements are: Psychiatrist or psychologist experienced in the use of hypnosis must conduct the session; the professional conducting the session should be independent of and not regularly employed by prosecutor, investigator, or defense; any information given to the hypnotist by law enforcement personnel or defense prior to hypnotic session must be recorded, either in writing or another suitable form;

before inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them; all contacts between hypnotist and subject must be recorded, including the preinduction interview, the hypnotic session, and the posthypnotic period; and only the hypnotist and the subject should be present during any phase of the hypnotic session.

In the case at bar the testimony of the three hypnotized witnesses concerning the subject matter adduced at the respective pretrial hypnotic interviews was inadmissible whether we adopt the basic holdings of the *Mack* and *Mena* cases or the holdings of the *Hurd* case. We believe the better rule to be that followed in the *Mack* and *Mena* cases.

To require the admissibility of hypnotically induced testimony to be determined on a case-by-case basis based on the testimony of expert witnesses produced by the parties, as required by *Hurd*, is neither sound nor practical. To compare the "recollections" of a witness whose testimony has been hypnotically induced to the "recollections" of an "ordinary" witness, and to determine whether the use of hypnosis was a feasibly reliable means of restoring memory comparable to normal recall in its accuracy, is virtually impossible.

The requirements for determining a minimum level of reliability for hypnotically induced testimony set out in *Hurd* are grounded upon the opinions and testimony of an eminent expert in the field of hypnosis. The same expert testified to essentially the same conclusions in the *Mack* case, and also testified that, in his opinion, a witness' testimony to a "memory" retrieved under hypnosis was infinitely less reliable as an indicator of truth than the results of a polygraph test. To base the admissibility of evidence in a given case on the testimony of competing expert witnesses imposes unjustified burdens on the criminal justice system in the field of hypnosis where the consensus of expert testimony indicates that no expert can determine whether

memory retrieved by hypnosis or any part of that memory is truth, falsehood, or fantasy.

We hold that until hypnosis gains acceptance to the point where experts in the field widely share the view that memories are accurately improved without undue danger of distortion, delusion, or fantasy, a witness who has been previously questioned under hypnosis may not testify in a criminal proceeding concerning the subject matter adduced at the pretrial hypnotic interview. Our holding does not exclude otherwise admissible evidence, leads to which were obtained during an hypnotic interview.

It should be noted that in this case a complete record of each hypnotic interview was made and was introduced at the hearing on the motion in limine. From that record the court, on retrial, may determine the subject matter adduced at the pretrial hypnotic interviews, and testimony of the witness as to that subject matter is inadmissible. Testimony as to other subjects may or may not be admissible.

In the present case the testimony now held to be inadmissible was clearly prejudicial, and reversal and remand for further proceedings is required. In view of the disposition made, it is unnecessary to discuss the defendant's remaining assignments of error.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

BRODKEY, J., concurs in the result.

CLINTON, J., concurring in the result.

I concur in the result. I agree that in the present state of informed knowledge the use of hypnosis as a "truth" determining device is in grave doubt. In this record the only evidence on that question indicates that it is not a reliable device for resurrecting hidden factual recollections of a witness. The State itself offered no testimony at all to establish the reliability of the procedure. I agree that the procedure should not be used in any future case unless reliability has been

established and an appropriate foundation laid.

I am uncertain as to the extent to which it will restrict the use of the hypnotized witness' testimony on the retrial of this case. The opinion excludes testimony which is the "subject matter" of the pretrial hypnotic interview. The term "subject matter" is not defined and the opinion offers no guidance to the trial court as to what it is to do on remand.

If, for example, on remand it can be reliably determined what the witness Monica Zimmerman remembered previous to and independently of the hypnotic session, then that testimony, in my judgment, would be admissible. If it cannot be reliably determined, then all testimony concerning the "subject matter" of the hypnotic interview must be barred.

BOSLAUGH and HASTINGS, JJ., join in this concurrence.