**Anthony E. PETERSON, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 780S200.**

Supreme Court of Indiana.

May 11, 1983.

David M. Adams, Bruce A. Boje, Castor, Richards, Adams & Boje, Noblesville, for appellant.

Linley E. Pearson, Atty. Gen., Latriealle Wheat, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

On July 12, 1979, Defendant-Appellant Anthony E. Peterson was found guilty of murder by a jury in the Hamilton Circuit Court. After further deliberation, however, the jury did not recommend the death penalty. The trial judge subsequently sentenced Peterson to fifty years imprisonment. Although several meritorious issues are presented to us in this direct appeal, we consider only one issue pertinent as we find that Appellant's conviction must be reversed. The issue upon which we reverse concerns the identification testimony of State's witness Gary Szeszycki, who was able to identify Appellant Peterson only after having been hypnotized.

On October 25, 1978, Marjorie Carter worked as a cashier at Brock's Pharmacy in the 3800 block of 38th Street in Indianapolis. Specifically, she testified that she worked with Karen Jeter behind the cashier counter at the front of the store. At approximately 5:15 p.m., Carter observed a young man walk into the store and proceed to the rear where he disappeared from her view. At about 5:37 p.m., Carter was approached at the cashier counter by two other young men, one of whom pulled a shotgun on her. The two men placed Carter, Jeter and the store's customers on the floor

and took various objects from them as well as money from the cash register. Shortly thereafter, Carter heard a gunshot from the back of the store. Carter then saw the man whom she observed walking into the store at 5:15 come from the back of the store wearing a mask over his face and carrying a shotgun. He had Gary Szeszycki, the store's stockboy, in tow. The three men walked out the store's front door with Szeszycki. Szeszycki returned a few minutes later and the police alarm was sounded. Carter initially could not identify Peterson as the man who came into the store at 5:15 and walked to the rear, later emerging with a mask over his face. She did, however, subsequently determine that Peterson was that man and, over objection, identified Peterson at trial.

Gary Szeszycki testified that he was near the prescription department in the rear of the store when a young man came to the rear of the store at approximately 5:15. Szeszycki said that the man asked him where he could find some asthma medicine. After assisting the man, Szeszycki resumed his stock duties but soon noticed that the same young man was behind the prescription counter with Pharmacist John Stockdale. Knowing that customers ordinarily were not allowed behind the counter, Szeszycki approached the counter only to discover that the man had a gun pointed at Stockdale. The man ordered Szeszycki and Stockdale, at gunpoint, to a different location in the store. Stockdale told Szeszycki to remain calm and to do what the gunman directed as the gunman followed Stockdale, who followed Szeszycki. The man ordered Szeszycki and Stockdale to return to the pharmacy department. When they were again near the prescription counter, Szeszycki heard a shot and felt a blow to his head. He did not become unconscious. Szeszycki heard a man come from the front of the store and ask: "What's taking so long?" This man and the gunman grabbed Szeszycki by the arms, pulled him to his feet and took him into the pharmacy area. Szeszycki there noticed John Stockdale lying on the floor in a pool of blood. The two men demanded to know where certain drugs were kept and ordered Szeszycki to aid them in collecting the drugs. After the two seemed satisfied with what they had collected, they took Szeszycki to the front of the store. The three men then left the store taking Szeszycki out into the parking lot where they released him. The man who came into the store at 5:15 and who apparently shot Stockdale said to Szeszycki: "If you identify me, I will kill you."

When the police came to investigate, Szeszycki could recount the details of these crimes but could not identify any of the perpetrators. After three men were subsequently arrested in Muncie on a tip from a police informant, Szeszycki was unable to identify the man who shot Stockdale from a photographic array which included Peterson's picture. Szeszycki also attended a lineup including Peterson but again was unable to identify Peterson or anyone else as the person who shot Stockdale. Szeszycki subsequently agreed to be hypnotized in an attempt to aid his memory recall. On January 29, 1979, Detective Sergeant Virgil Vandagriff of the Marion County Sheriff's Department hypnotized Szeszycki at the Indianapolis Police Department's Headquarters. After this one session, Szeszycki identified a photograph of Peterson as the gunman behind the prescription counter. He also selected a photograph of a man he called "the second guy."

Peterson consistently objected to Szeszycki's testimony because of the use of hypnosis on Szeszycki. Peterson initially filed with the trial court a Motion to Suppress. After a hearing, this Motion was overruled. Peterson later filed a Motion in Limine, which also was overruled. Finally, Peterson objected to Szeszycki's testimony at trial. The trial judge overruled Peterson's objection but indicated that the record would reflect Peterson's continuing objection to Szeszycki's testimony. Peterson's objection to Szeszycki's identification testimony following hypnosis is based upon the following three grounds:

1. hypnosis has not gained such general acceptance in the scientific community so as to constitute a reliable and legally valid procedure for enhancing memory;

2. permitting Szeszycki to testify and to identify Peterson after having been hypnotized denied Peterson his right to properly confront and cross-examine Szeszycki; and

3. by subjecting Szeszycki to hypnosis, the State may have destroyed material evidence by tampering with his original memory of the events in question.

Although this Court has considered hypnosis before, the specific issue now before us is new to Indiana. In *Strong v. State,* (1982) Ind., 435 N.E.2d 969, *reh. denied,* Witness Miller observed Defendant Strong murder her husband while standing three to four feet away from her. Prior to being hypnotized, Miller provided the police with Strong's description and selected his photograph from an array of photographs. Sergeant Vandagriff, the hypnotist in the instant case, hypnotized Miller to obtain a drawing of the perpetrator. The composite picture drawn from the description Miller proffered while in a hypnotic trance was admitted into evidence over Strong's pretrial suppression motion and objection at trial. Justice Prentice authored this Court's opinion which held that evidence derived from a witness while in a hypnotic trance is inherently unreliable and should be excluded as having no probative value. We held specifically:

"Assuming, *arguendo,* that hypnosis can effect recall not otherwise attainable, the product is not susceptible of cross examination and should be excluded for this reason alone. The record shows that the composite drawing was such a product. It was, therefore, error to admit it into evidence."

*Strong,* 435 N.E.2d at 970. We further addressed Miller's in-court identification of Defendant Strong as follows:

"Assuming, *arguendo,* that the hypnotic session was impermissibly suggestive, we must, nevertheless, determine whether or not the State demonstrated, through clear and convincing evidence, that the in-court identification of the defendant has a factual basis independent of the hypnotic session. *Merrifield v. State,* (1980) Ind., 400 N.E.2d 146, 149; *Williams*

*v. State,* (1976) 265 Ind. 190, 197, 352 N.E.2d 733, 740. The factors that we consider in determining whether or not a potentially tainted identification has a sufficient independent factual basis are reviewed in *Morgan v. State,* (1980) Ind., 400 N.E.2d 111, 113; and are in substantial compliance with the due process requirements of *Manson v. Brathwaite,* (1977) 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140, 154."

*Id.* The record in *Strong* showed that on the day following the murder and some five days before Miller's hypnotic session, Miller selected a photograph of Strong as being the perpetrator. Moreover, Miller testified at trial that she had seen Strong on several occasions prior to when she first saw him on the day of the murder. We found, therefore, ample factual evidence of a sufficient basis independent of hypnosis to support Miller's in-court identification.

In the instant case, Szeszycki first identified Peterson's photograph on the day after his hypnotic session. He subsequently identified Peterson in person in court. Szeszycki's renewed memory thusly resulted from his hypnotic session although it was not the same type of product as Miller's composite drawing in *Strong.* This difference is insignificant, however, since both products are the direct results of a hypnotic session and must satisfy the same test to constitute probative evidence. We note that Szeszycki's identification testimony cannot be supported by any factual basis independent of his hypnotic session. Szeszycki could not explain how and why he was suddenly able to identify Peterson. Furthermore, he could not relate his identification to any facts relative to the observations he made during Stockdale's murder nor could he explain his identification by referring to any particular incident during his hypnotic session, except that Vandagriff told him that after the session he would remember. Szeszycki simply testified at trial that he was then able to identify Peterson as the murderer. This brings us to Peterson's precise issue which is whether or not a previously hypnotized witness should

be permitted to testify in a criminal proceeding concerning a subject matter adduced during a pretrial hypnotic interview. It is our holding that such a witness should not be so permitted to testify.

We find the analysis of two sister states who have faced this same issue helpful towards our determination here. In *State v. Mack,* (1980) Minn., 292 N.W.2d 764, victim Marion Erickson was brought to a Minneapolis medical center bleeding profusely from her vagina. She had met and danced with Defendant Mack at a local bar that evening and had gone to a motel with him on his motorcycle. Mack brought her to the hospital claiming that she started to bleed while they were having sexual intercourse. Examination revealed, however, that she had a severe laceration deep within her vagina which could not have been caused by intercourse but apparently was caused by a sharp object. Erickson had no recollection of how she became injured but stated that she thought she had been in a motorcycle accident. She said that she could not remember anything about the accident except that she did not think Mack was responsible for her injury. She had been drinking heavily and was very intoxicated. Some six weeks after the incident, Lieutenant Weiss of the Minneapolis Police Department arranged for Erickson to be hypnotized by a self-taught, "lay" hypnotist. While in a hypnotic trance, Erickson stated that Mack had told her that he took a switch blade knife and injured her to "get even" with her for once leaving him. The following day, Erickson gave the Minneapolis police a statement recounting as her present memory the events which she had reported under hypnosis. Before proceeding with Mack's prosecution, the criminal trial court certified the question concerning the use of hypnotically induced testimony to the Minnesota Supreme Court because the case was one of first impression in Minnesota.

In a well reasoned and unanimous opinion authored by Justice Wahl, the Minnesota Supreme Court found the testimony of Erickson inadmissible on precisely the same grounds raised by Peterson in the instant case. After considering testimony from five hypnotism experts, including Dr. Martin Orne who was called by Peterson in the instant case, the Minnesota Court found that hypnotically prompted testimony does not meet the standards announced in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), regarding the admission of scientific test results. Applying *Frye,* the *Mack* Court held:

> "Under the *Frye* rule, the results of mechanical or scientific testing are not admissible unless the testing has developed or improved to the point where experts in the field widely share the view that the results are scientifically reliable as accurate. Although hypnotically-adduced 'memory' is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context, where the best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation—a filling of gaps with fantasy. Such results are not scientifically reliable as accurate."

*Mack,* 292 N.E.2d at 768. The Minnesota Court further found that the use of Erickson's hypnotically induced testimony would preclude Defendant Mack's cross-examination of her.

In *State v. Mena,* (1981) 128 Ariz. 226, 624 P.2d 1274, *reh. denied,* the Arizona Supreme Court was presented with the case of victim Koors who was attacked by three assailants and stabbed with a steak knife. Sometime after his assault, Koors went with a police officer to be hypnotized by two doctors in an attempt to increase his recollection of the details of his assault. The doctors questioned Koors about the incident while he was under hypnosis and told him that he would remember what he had related to them during the session after he came out of hypnosis. Objection was raised at trial to Koors' testimony on the grounds that his testimony was tainted since it could not be determined what his actual recollection was and what might have been suggested by the hypnotists. The Arizona Court held:

"The determination of the guilt or innocence of an accused should not depend on the unknown consequences of a procedure concededly used for the purpose of changing in some way a witness' memory. Therefore, until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases."

Mena, 128 Ariz. at 231, 624 P.2d at 1279. The view of the Mena Court that evidence derived through hypnosis is inherently unreliable and therefore should be excluded has general acceptance in a large number of other jurisdictions. See citations in Strong, 435 N.E.2d at 970.

Peterson's position in the instant case is that hypnosis is so unreliable that it has not gained general acceptance in the scientific community as a technique for accurately enhancing memory recall and therefore should not be legally recognized and relied upon. A general examination of hypnotism scholarship shows support for this contention. Two professional organizations have adopted identical resolutions relating to the use of hypnosis to facilitate witness recall. The resolutions, passed by the Society For Clinical and Experimental Hypnosis in October, 1978, and by the International Society of Hypnosis in August, 1979, read as follows:

"[This organization] views with alarm the tendency for police officers with minimal training in hypnosis and without a broad professional background in the healing arts employing hypnosis to presumably facilitate recall of witnesses or victims privy to the occurrence of some crime. Because we recognize that hypnotically aided recall may produce either accurate memories or at times may facilitate the creation of pseudo memories, or fantasies that are accepted as real by subject and hypnotist alike, we are deeply troubled by the utilization of this technique among the police. It must be emphasized that there is no known way of distinguishing with certainty between actual recall and pseudo memories except by independent verification.

Police officers typically have had limited technical training and lack the broad understanding of psychology and psychopathology. Their orientation is to obtain the information needed to solve a crime rather than a concern focusing on protecting the health of the subject who was either witness to, [or] victim of, a crime. Finally, police officers understandably have strong views as to who is likely to be guilty of a crime and may easily [and] inadvertently bias the hypnotized subject's memories even without themselves being aware of their actions.

For these and related reasons, [this organization] is strongly opposed to the training of police officers as hypnotechnicians and the use of hypnosis by the police officer. In those instances when hypnosis is appropriately used in law enforcement trained psychiatrists or psychologists with experience in the forensic use of hypnosis should be employed, care must be taken to control the amount of information wittingly and unwittingly provided to the subject, and all interactions with the subject before, during, and after hypnosis must be videotaped.

[This organization] views it as unethical to train lay individuals in the use of hypnosis, to collaborate with laymen in the use of hypnosis, or to serve as consultant for laymen who are utilizing hypnosis."

27 Int'l J. of Clinical & Experimental Hypnosis 452, 453 (1979).

Dr. Martin Orne, Professor of Psychiatry at the University of Pennsylvania Medical School and Director of the Unit for Experimental Psychiatry at the Institute of Pennsylvania Hospital, appeared at trial as an expert witness on Peterson's behalf. He testified that hypnosis is a state of being in which an individual becomes responsive to suggestion, his critical judgment is diminished and he is more likely to accept statements than if he were not hypnotized. On the basis of his research and experimenta-

tion, Dr. Orne has written that hypnosis facilitates both a modest increase in memory recall and a proclivity to confabulate. Orne, *Hypnotized Witnesses May Remember Too Much,* 64 A.B.A.J. 187 (1978). At trial, Dr. Orne defined confabulation as a process by which a witness fills in memory blanks or elaborates on a memory trace to create a completed thought. The tendency to confabulate indicates that hypnotically induced memory is not necessarily historically accurate and therefore is unreliable. Other authorities have reported similar findings. See Spector & Foster, *Admissibility of Hypnotic Statements: Is The Law of Evidence Susceptible?,* 38 Ohio St. L.J. 567 (1977); Hull, *Hypnosis and Suggestibility, An Experimental Approach,* (1968); A. Weitzenhoffer, *Hypnotism, An Objective Study in Suggestibility,* (1953). Dr. Orne also has reported:

> "Hypnotic age regression does seem to make the subject less concerned about the accuracy of his memory and he fills in memory gaps with vivid imagination. This in turn may promote recall of repressed, emotionally charged actual experiences; however, even then it is often difficult to distinguish fact from fiction. The individual may be both convinced and convincing despite a tendency to elaborate, embroider, and distort what actually occurred."

Orne, *Hypnosis,* 9 Encyclopaedia Britannica 136 (15th Ed.1974).

We may assume that there is general agreement that hypnosis is an extremely useful investigating tool when a witness is unable to remember verifiable factual information which provides new leads to the solution of a crime. The witness may, for example, bring forth information previously unknown to law enforcement authorities such as a license plate number which can be used to identify a suspect. As the Minnesota Supreme Court expressed in *Mack, supra:*

> "Experts see no reasonable objection to the use of hypnosis in this manner, provided the witness is willing, so long as the material remembered during hypnosis is not subsequently used in court as part of an eye witness' testimony."

*Mack,* 292 N.W.2d at 771. Dr. Martin Reiser was called by the State as its expert witness in the instant case. Dr. Reiser testified that he does not rely on hypnotism itself but rather attempts to corroborate statements made under hypnosis. He further indicated that in all but one of his many uses of hypnosis in law enforcement, a suspect was not in custody and hypnosis was used to obtain information by which to locate suspects. The evidence in the instant case is clear that hypnosis here was used solely to enhance Szeszycki's memory and not to lead to further evidence. Detective Vandagriff did not determine prior to the hypnotic session what the state of Szeszycki's memory was up to that point nor did he in any way attempt to verify or corroborate the statements Szeszycki made under hypnosis. Vandagriff merely told Szeszycki that his memory would be enhanced after the hypnotic session.

■ Appellant Peterson claims that the use of Szeszycki's testimony after hypnosis denied him of his right to confrontation and cross-examination. We find merit in this argument. As we have previously stated, Szeszycki was unable to give any factual basis or explanation for his ability to identify Peterson after hypnosis when he was not able to identify Peterson before hypnosis. The State argues that this fact and the circumstances of Szeszycki's hypnotic session, including a videotape of the session, were revealed to the jury, therefore, Peterson's challenge should go only to the weight of Szeszycki's testimony and not to its admissibility. We do not agree. Since there was an independent factual basis for Szeszycki's general testimony with respect to the occurrence of Stockdale's murder, we now find that the trial court properly admitted this testimony. The nature of Szeszycki's testimony as to Peterson's identification, however, was such that it was impossible for Peterson to exercise his due process rights to confront and cross-examine. Furthermore, Szeszycki's identification testimony was inherently tainted as we have above related. We cannot find the

admission of this identification testimony to be harmless regardless of whether or not we think that the jury might have convicted Peterson notwithstanding Szeszycki's identification because we agree with Peterson that the probative weight given by the jury to Szeszycki's testimony in its entirety was no doubt especially significant in view of Szeszycki's involvement in the incident precipitating Stockdale's murder. Accordingly, we find that the trial court reversibly erred by permitting Szeszycki to testify as to his identification of Peterson. The judgment of the trial court is reversed and a new trial is ordered.

GIVAN, C.J., and DeBRULER and PRENTICE, JJ., concur.

HUNTER, J., concurs, with separate opinion.

HUNTER, Justice, concurring.

I concur with the majority opinion but I feel that the questions surrounding the use of hypnosis are so complex that further clarification of our position is necessary. This Court has addressed the hypnosis issues in two prior major cases. As the majority points out, in *Strong v. State,* (1982) Ind., 435 N.E.2d 969, we held that evidence derived from a witness while he is under hypnosis is inherently unreliable and must be excluded as having no probative value. Next, in *Pearson v. State,* (1982) Ind., 441 N.E.2d 468, we held that the fact that a witness had been hypnotized prior to trial did not make that witness totally incompetent to testify, and that the witness could testify posthypnotically to what he or she was able to recall before hypnosis. Furthermore, we held that when such a witness testified, the facts surrounding the hypnosis session, as well as the degree to which the witness's statements were changed by the hypnosis session, must be presented to the jury in order for the jury to judge the reliability of the witness's testimony. Finally, we held that admission of testimony which was in addition to or different from the prehypnotic recall, although such testimony was inherently unreliable, was not *per se* reversible error, when the changes in the testimony were not significant and the jury had sufficient facts to be able to judge the reliability of the witness's perception of the events which occurred before the hypnosis session.

In the instant case, this Court affirms the above holdings but finds that the change in Szeszycki's identification testimony was of such underlying significance to the trial that the admission of this testimony was reversible error. I agree fully with this holding.

It is clear that Indiana has wisely not adopted the "total exclusion" rule which is used in some jurisdictions where a previously hypnotized witness is incompetent to testify in a criminal trial about *any* events which were the subject of hypnosis. *People v. Shirley,* (1982) 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775; *People v. Gonzales,* (1981) 108 Mich.App. 145, 310 N.W.2d 306; *State v. Palmer,* (1981) 210 Neb. 206, 313 N.W.2d 648; *Commonwealth v. Nazarovitch,* (1981) 496 Pa. 97, 436 A.2d 170; *State v. Mack,* (1980) Minn., 292 N.W.2d 764.

One state which had originally adopted the "total exclusion" rule has recently modified its position. Arizona now allows a previously hypnotized witness to testify with regard to matters which he was able to recall and relate prior to hypnosis. *State ex rel. Collins v. Superior Court,* (1982) 132 Ariz. 180, 644 P.2d 1266 (supplemental opinion on rehearing) (modifying in part, *State v. Mena,* (1981) 128 Ariz. 226, 624 P.2d 1274).

Our position on hypnosis also does not follow those jurisdictions which allow the admission of all hypnotically refreshed testimony and hold that the problems inherent in its use go to the weight of the evidence. *Chapman v. State,* (1982) Wyo., 638 P.2d 1280; *People v. Smrekar,* (1979) 68 Ill. App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848; *State v. McQueen,* (1978) 295 N.C. 96, 244 S.E.2d 414. Rather our position is between these two extremes.

The instant case sets out this Court's position on the evidentiary use of testimony of a previously hypnotized witness as: (1)

the witness is not totally incompetent to testify and there will be no error when the witness testifies to what was remembered before the hypnosis; (2) any evidence derived from a witness while he or she is under hypnosis is inherently unreliable and must be excluded as having no probative value; (3) if evidence that is the product of a hypnosis session is admitted during trial, it will not be reversible error if the jury is aware of all the circumstances surrounding the hypnosis session and the degree to which the witness's statements were changed by the hypnosis, and if the changes in the witness's statements were not significant or did not relate to essential elements of the offense. This position necessarily requires a case-by-case determination of the effect of the admission of testimony from a previously hypnotized witness, and I believe this brings about more equitable results than are possible under the "total exclusion" rule.