**Terry Wayne KING, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 782S271.**

Supreme Court of Indiana.

March 19, 1984.

Rehearing Denied May 10, 1984.

Anthony J. Corizzi, Judith M. Cannavo, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-appellant, Terry Wayne King, was convicted of Conspiracy to Commit A Robbery, Ind.Code §§ 35–41–5–2 (Burns Repl. 1979) and 35–42–5–1 (Burns Repl. 1979), at the conclusion of a jury trial in Marion Superior Court on January 15, 1982. The trial court sentenced defendant King to thirty (30) years imprisonment. He now appeals.

Five issues are raised on appeal, concerning:

(1) whether the trial court erred in admitting the testimony of witnesses who had previously been hypnotized;

(2) whether a party can use leading questions on its own witness through the use of prior statements;

(3) whether the photo identification of the defendant was unduly suggestive;

(4) whether a letter written by a State's witness should have been admitted into evidence; and,

(5) whether there is sufficient evidence to convict the defendant of conspiracy to commit a robbery.

The evidence most favorable to the State revealed that on July 28, 1980, Gary Stephens and defendant Terry Wayne King picked up Dawn Thomson and Ron Johnson in a rented silver Oldsmobile Cutlass. According to Thomson, the four were ostensibly going for a ride through the city of Indianapolis. They stopped to buy some Cokes and Stephens asked Ron Johnson to drive. After driving for twenty minutes, Ron Johnson was asked to stop on a side street. Johnson parked the car near Schweitzer Industries, which was located on Beecher Street in Indianapolis. Defendant and Stephens left the car and walked hurriedly away. Stephens was carrying a blue towel concealing what appeared to be the blunt end of a chrome or silver pipe. In reality it was a sawed-off shotgun.

Thomson turned to Johnson and asked where the two men were going. Johnson informed her, laughingly, that because "Gary has a gun, I believe he's going to shoot somebody." Johnson also said they were going to rob some place. Thomson and Johnson waited about 20 minutes when Johnson became concerned and said they should leave. Johnson turned the car around and as he was driving through an underpass, he slammed on the brakes because he saw the defendant and Stephens running toward them. The two men hopped into the car and were visibly upset. Johnson asked where they had been but the two men did not respond at first. Finally, Stephens told Johnson that someone was dead. Thomson said Stephens looked sick and sweaty and was so upset he could hardly speak. Defendant King told Johnson and Thomson that "we went in there to rob him and when Gary told Mr. Brooks to get down it was a hair trigger, he said, and his finger must have hit the trigger, 'cause when he told the man to get down on the floor it went off. The man didn't even have time to get down on the floor." When the group arrived at the home of Johnson's father, Johnson and Thomson got out and the defendant said that he and Stephens were "going to get rid of this gun."

Persons living in the neighborhood of Schweitzer Industries heard an explosion on the day of the murder, July 28, 1980, and saw two men run from the building. Marilyn Sue Jones, Lisa Jones, and Jim Angell were riding bicycles on Pleasant Run Parkway that same afternoon and observed two men getting into a silver automobile. Marilyn and Lisa Jones later identified the defendant as one of the two men.

The murder and intended robbery victim, Mr. Richard Brooks, was an employee of Schweitzer Industries. He was found fatally wounded on the premises of his employer on July 28, 1980. The cause of death was a shotgun blast to the back. It was common knowledge among the employees of Schweitzer Industries that the victim carried large amounts of cash. Ron Johnson, the defendant's companion on the day of the murder, had previously been employed by Schweitzer Industries.

I

The defendant claims that the trial court erred in permitting two witnesses, Lisa Jones and Marilyn Jones, to identify the defendant as one of the two men entering a silver automobile near the scene of the victim's murder on July 28. Defendant filed a motion *in limine* and a motion to suppress the identification testimony of both of these witnesses, claiming that the identification was tainted by hypnotism and should not be admitted. Both motions were denied and the witnesses were permitted to testify at trial. The State argues that the error, if any, in the admission of such evidence is rendered harmless because other solid and direct evidence also placed the defendant near the scene of the crime. Thus, the erroneously admitted evidence is merely cumulative of other undisputed and

properly admitted evidence. *McConnell v. State*, (1982) Ind., 436 N.E.2d 1097, 1106; *Jackson v. State*, (1980) Ind., 402 N.E.2d 947, 951.

This Court has previously held that evidence derived from a witness while he is in a hypnotic trance is inherently unreliable and should be excluded for a lack of probative value. *Peterson v. State*, (1983) Ind., 448 N.E.2d 673, 675; *Strong v. State*, (1982) Ind., 435 N.E.2d 969, 970. We also held that although a witness has been hypnotized prior to trial, this witness is not totally incompetent to testify and the witness could testify during the trial about the events he or she recalled prior to the hypnotic session. *Peterson, supra; Pearson v. State*, (1982) Ind., 441 N.E.2d 468. Thus, in *Peterson*, the witness could testify about his memory of the murder because there was an independent factual basis for his recollection. However, the witness' identification of defendant Peterson should have been excluded because it denied the defendant his right of confrontation and cross-examination of witnesses. 448 N.E.2d at 678. As we carefully noted in that case, the witness was unable to give any factual basis or explanation for his ability to identify defendant Peterson after hypnosis when he was not able to identify the defendant before hypnosis. *Id.*

In the present case, Marilyn Jones and Lisa Jones were both hypnotized by a member of the Indiana State Police who had some special training in the field of hypnosis. The defendant is correct that any testimony adduced during the hypnotic trance was not admissible into evidence where the witness had no independent basis for such testimony. *Peterson, supra.* Marilyn Jones testified at the hearing on the motion to suppress that her recollection of the events was not materially altered by hypnosis. The only fact different in her recollection after being hypnotized was that she could recall grease on the leg of one man's trousers. The defendant attempts to rebut this in the argument section of his appellate brief. We do note, however, that defense counsel did not attempt to refute her statement at the hearing on the motion to suppress. Thus, it appears that the trial court reasonably concluded, from the evidence presented before it, that Marilyn's testimony had not been tainted by the hypnosis session. As for Lisa, it appears that she remembered more details after being hypnotized than before being hypnotized. The record does seem to bear out that she probably could not have identified the defendant prior to hypnosis, and she should not have been allowed to do so after hypnosis.

Regardless of the questionable admissibility of the witnesses' identification testimony, the complained of error in this case is rendered harmless because of the cumulative nature of the testimony. *McConnell, supra.* Dawn Thomson was a major prosecution witness. Her testimony described the silver automobile that transported the defendant to Schweitzer Industries and was awaiting his return after the attempted robbery and murder. Thomson was there on the scene, waiting inside the car with Johnson for the return of Stephens and the defendant. There is no question that Marilyn and Lisa described, prior to hypnosis, a silver car in the same location where Thomson said the defendant hopped in. Marilyn and Lisa also saw two men running towards the car. Thomson testified about all this in addition to specifically stating that defendant King was one of the men seen running to the car. Thus, the Jones' testimony was merely cumulative to Thomson's damaging testimony. In Indiana, it is well settled that the introduction of otherwise inadmissible evidence that is merely cumulative is not prejudicial error. *Mitchell v. State*, (1972) 259 Ind. 418, 287 N.E.2d 860; see *Cornett v. State*, (1983) Ind., 450 N.E.2d 498 (although admission of spectrographic voice analysis was clearly wrong because of its unreliability, any error was rendered harmless due to the cumulative nature of the testimony). There is no reversible error on this issue.

II

Dawn Thomson was called by the State as a prosecution witness and was

apparently reluctant to implicate her friends in this serious matter. When questioned about the day of the murder, Thomson often stated that she could not recall what happened on that date. The prosecutor asked her leading questions directed toward previous statements she had made about the crime and Thomson was permitted to give answers based on those questions. Defendant contends that the trial court committed reversible error in permitting questions and answers in this manner. The defendant also contends that the State violated an *in limine* order when Thomson was questioned about her previous statements. Some of the statements used to refresh Thomson's recollection were made by her in a previous trial in which Gary Stephens was convicted. Earlier, the trial court had granted the State's motion *in limine* requesting that no mention be made regarding the other trials. The record does not show, however, that the prosecutor or Dawn Thomson ever indicated that her previous statements were from her testimony in an earlier trial. There was no violation of this order that in any way prejudiced the defendant; absent prejudice, there is no need or cause to reverse. *Murray v. State,* (1982) Ind., 442 N.E.2d 1012.

■ The trial court allowed the State to ask leading questions of its own witness and thereby obtain answers. It appears that this was the only way Thomson could testify accurately about the events which occurred on July 28, 1980. "Whether a leading question is to be allowed is a decision largely within the discretion of the trial court. On appeal it must be shown that there was an abuse of discretion (citations omitted)." *Shipman v. State,* (1962) 243 Ind. 245, 256, 183 N.E.2d 823, 828; *see also Rapier v. State,* (1982) Ind., 435 N.E.2d 31. Thomson testified, in her own words, about her memory of the events after the prosecutor read portions of her previous statement, which had been taken under oath. We see no abuse of discretion in this manner of questioning that would justify a reversal.

## III

Defendant argues for reversal based on the photo identification of him by Lisa and Marilyn Jones. He claims that this identification was made following unduly suggestive procedures by the police. Defendant points out the crime occurred on July 28, 1980, and Lisa and Marilyn Jones were hypnotized on July 29 and July 30; however, they did not identify defendant King in a photo array until March 25, 1981. Detective William Burgess testified that he showed these two witnesses approximately 700 to 800 pictures the night of the incident and anywhere from 850 to 900 pictures throughout the rest of the investigation. Although Burgess said Marilyn and Lisa were not able to identify the defendant prior to March 25, he was not able to state that the defendant's photograph had been in the mug books previously examined.

The testimony of Lisa Jones and Burgess indicated that Burgess arrived at the Jones residence around 10:00 p.m., on March 25, 1981. Burgess said he had new suspects and good prospects for the two women to examine. Burgess had written the defendant's name on the back of his photograph but instructed the women not to look at the backs of the photographs. Burgess gave each of the women an array of photographs and asked if they could identify anyone. If they could, they were then to turn over the photograph, initial and date the back, and write a few words about the suspect. After that, the arrays were to be exchanged and the same procedure followed. Both women picked defendant King's photograph and on the back of the photograph, Marilyn Jones wrote: "Looks like one of the men who got in the car." Lisa Jones wrote: "This is the man that got in on the passenger side." Marilyn Jones admitted that she had heard the names of the arrested suspects on the radio before she identified the defendant's photograph. When Marilyn turned the photograph over to initial it, she recognized the defendant's name as belonging to one of the arrested suspects.

Defendant's argument about the defective nature of the photo identification is not too clear, but it appears he wants it thrown out because of three reasons: the length of time between the crime and the identification; the hypnosis tainted the women's identification; and the language about the good prospects in the last array. Assuming, *arguendo*, that the photographic identification was unduly suggestive and defective, we have the same situation as in Issue I, *supra*. This testimony is cumulative to that of the major witness, Dawn Thomson, who placed the defendant near the scene of the crime on the day in question. We find that any error in this regard as we indicated in Issue I, regarding hypnotism, is cumulative and harmless, not meriting reversal. *McConnell, supra; Jackson, supra.*

## IV

In the cross-examination of Dawn Thomson, the defendant moved to admit a letter Thomson wrote and identified, but was prevented from doing so on the basis that the trial court had granted the State's motion *in limine* preventing the defendant, his counsel, or witnesses from mentioning the results of prior trials because the prejudice at the introduction of the letter far outweighed its probative value and relevance. On November 18, 1981, Dawn Thomson had written this letter to Royce Denton, an inmate at the Marion County Jail. The contents of the letter were as follows:

11–18–81

Dear Roy,

I got your letter the 13th & I only got up the courage today to write you back. You see, Roy, I went on that witness stand & got Ronnie out of jail & away from 40 years in prison. The night he got out he found me a ride home with his uncle, Sonny, and said he was going out to have a couple of drinks. Roy, that night was the last night that I saw him. *Yes*, it hurts to be loyal to the same man for over 2 years and never ask for anything, and for him to put me through this whole ordeal, have my life threatened on 3 occasions, then for him to just waltz off the picture like he doesn't even know me. Now I have to dodge bullets for the rest of my life because he doesn't—didn't—care enough to even give me the curtesy (sic) of telling me he was leaving. Roy, even if he had of left and then wrote me to tell me was alive, I wouldn't have liked it, but I would have accepted that. But I'm sure you have your own problems, what with you going to court and all. Roy, I just want to thank you and all the guys for being so nice to me all the time I was coming up there and I wish the best for all of you. Tell Tonya and Mike and Star and Sonny I said hi and I miss 'em. I better let you go before I cry. You know something, I didn't even get to stay with him for 1 night. I only saw him for a total of 20 minutes. Awful, isn't it? Well, Roy, I better let you go. Keep fighting and keep the faith.

Jilted and depressed

Dawn (Bev)

P.S. If you hear from Ron, please tell him I was worried and would appreciate a letter, telegram, postcard, ect., ect. (sic)

Dawn

The State contends that the letter shows Ron Johnson was acquitted but does not in any way show that Dawn Thomson perjured herself on Ron Johnson's behalf. The State further points out that if Dawn Thomson had given inconsistent testimony in the two prior trials, the defendant could have cross-examined her on the basis of her prior testimony instead of this letter without prejudicing the State by showing that Ron Johnson had been acquitted. Defendant claimed he had a right to question Dawn Thomson about the letter and to have it placed into evidence in order to question her credibility and motive for testifying.

The State cites *Patterson v. State,* (1975) 263 Ind. 55, 324 N.E.2d 482, where, with regard to the admissibility of evidence, when a fair conflict appears between one party's right to present relevant evidence and the other party's right to be

protected from the unfair prejudicial effects of such evidence, the trial court has wide latitude in determining admissibility, and reversal therefrom will result only when the trial court's ruling has created prejudicial imbalance between these two factors. *Id.* at 61, 324 N.E.2d at 486. It does not appear here that the trial court created such a prejudicial imbalance between the defendant's right to impeach the witness and the State's right not to be prejudiced by evidence of Ron Johnson's acquittal to the extent that there was an abuse of discretion. The contents of the letter do not indicate that there were inconsistencies in Thomson's testimony that could not be reached by referring directly to that testimony. Surely the defendant would have been able to show that the witness made prior inconsistent statements even though they were in a previous trial and even though they tended to show that Ron Johnson had been acquitted. As a matter of fact, one of Defendant's complaints was that the State used transcripts of prior testimony of Thomson to refresh her memory in this case, in which she implicated the defendant. The statements were not identified by the State during its examination as transcripts of a prior testimony but were referred to only as prior statements she had made. It is apparent that her prior testimony was not inconsistent and therefore the defendant's interpretation of her letter, indicating that it was, has no merit. We see no error on this issue.

V

Finally, the defendant claims the evidence was insufficient to support the verdict of the jury, claiming there was not substantial evidence of probative value to sustain a conviction of conspiracy to commit robbery since there was no direct evidence of such a conspiracy. Defendant's claim is based on the fact that no one testified as to an actual agreement between him and Stephens to commit a robbery at Schweitzer Industries. He particularly points out that Dawn Thomson, the chief prosecution witness putting the defendant and Stephens at the scene, stated on cross-examination that she never heard any of the alleged co-conspirators agree to commit any kind of crime, nor did she ever hear them agree that Ron Johnson would drive the automobile and they would rob someone or kill someone.

In reviewing sufficiency of the evidence, this Court on appeal will not weigh the evidence nor judge the credibility of witnesses. We view only the evidence most favorable to the State and the reasonable and logical inferences drawn therefrom. If there is substantial evidence of probative value as to every element of the crime charged, the verdict will not be set aside. *Napier v. State,* (1983) Ind., 445 N.E.2d 1361; *Jackson v. State,* (1980) Ind., 402 N.E.2d 947.

As stated above, Dawn Thomson was asked if she wanted to accompany the three men and go for a ride. She agreed and Ron Johnson drove them to a point very near to the place of the robbery and subsequent murder. Defendant and Stephens left, Stephens carrying something wrapped in a towel that looked like a pipe or something similar, and they walked fast or "sort of ran" toward the Schweitzer plant. When they returned, the defendant told Thomson, "We went in there to rob him and when Gary told Mr. Brooks to get down it was a hair-trigger, he said, and his finger must have hit the trigger, 'cause when he told the man to get down on the floor the gun went off. The man didn't even have time to get down on the floor."

The requisite elements of conspiracy are: 1) agreement with another person to commit a felony, 2) with intent to commit the felony, and 3) an overt act in furtherance of the agreement. Ind.Code § 35–41–5–2. It appears from the defendant's statements to Thomson that he and Stephens agreed to commit a robbery at Schweitzer Industries, entertained the intent to commit robbery on July 28, 1980, and went so far as to intimidate their victim with a weapon before the gun discharged and Mr. Brooks was killed. Thus, the evidence showed an agreement, the in-

tent, and the overt act. The jury could reasonably infer that the defendant was guilty of conspiracy to commit a robbery.

The judgment of the trial court is affirmed.

GIVAN, C.J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.