James GARRISON, Appellant,

v.

STATE of Indiana, Appellee.

No. 49S00–9103–CR–205.

Supreme Court of Indiana.

April 8, 1992.

Ali A. Talib, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Preston W. Black, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in the conviction of appellant of one count of Rape, a Class A felony; four counts of Confinement, one count of Burglary, and three counts of Robbery, all Class B felonies; and a find-

ing of habitual offender status. He was sentenced to the maximum fifty (50) years for the rape count, further enhanced by thirty (30) years for the habitual status; and to the maximum twenty (20) years for each of the Class B felony counts. The sentences for the four counts of confinement were ordered served concurrently as were the three counts of robbery. Thus appellant received sentences of eighty (80) years, twenty (20) years, twenty (20) years, and twenty (20) years to be served consecutively for a total executed sentence of 140 years.

The facts are: At approximately 12:30 a.m. on December 2, 1986, appellant was driving around the west side of Indianapolis with Kevin Daniels when they were passed by a car driven by M.W., one of the victims in this case. Appellant followed her to her home, and as she pulled up to her garage, he said to Daniels, "Let's get her—Let's rob her." Appellant and Daniels then exited the car and ran into M.W.'s garage, where Daniels grabbed her from behind, holding a 13–inch length of broom handle to her throat, and asked, "Where is your husband?" As Daniels struck her on the head at least ten times with the stick, M.W. led him into the house and upstairs to the bedroom where her father, D.W., was sleeping. Daniels bound and beat D.W. while repeatedly demanding his money, then took his ring, watch, and wallet. Appellant, meanwhile, pulled M.W. into an adjacent bedroom, forced her to lie down, began to tie her up, then took her downstairs and continued beating her until she lost consciousness.

Daniels went into another bedroom where M.W.'s sister, R.W., was sleeping. He awakened her, asked her "Where's the money?", covered her head with pillows and took her purse and piggy bank. He then proceeded downstairs, where he observed appellant with his pants down astride the naked M.W., apparently having sexual intercourse. He wandered the house awhile and when he returned, he found appellant sitting on the couch and M.W. unconscious; after prodding from appellant, Daniels then had sex with M.W. and returned upstairs, where in another bedroom he encountered S.H., a friend of M.W., held a kitchen knife to her neck and demanded money, repeatedly ordered her to disrobe, ransacked the bedroom and took her ring and bracelet.

When M.W. awakened, she discovered she was nude, sore, bloody, and believed she had been raped. She heard someone ransacking the kitchen and upon overhearing someone say, "Watch her and make sure she doesn't run away," M.W. ran to a neighbor's house and called police. Deputy Karen Baumgart of the Marion County Sheriff's Department was the first officer to respond on the scene, and upon checking the house discovered Daniels in an upstairs bedroom literally with his pants down and unzipped. When asked whether anyone was with him, he responded that appellant was downstairs. Indeed, appellant was apprehended outside the victims' house, across the street in his parked car, underneath which was found the stick initially used to assault M.W. M.W. was transported in shock to the hospital, where she was treated for neck abrasions, head lacerations, and vaginal swelling. A vaginal swab revealed the presence of semen.

Appellant contends the trial court erred in denying his motion for mistrial made after juror number 11 observed appellant entering the courtroom from the adjacent lockup area. Appellant was not handcuffed or shackled, but he nonetheless claims prejudice due to the lockup noises coming through the open door. The trial court heard appellant's allegation of impropriety outside the jury's presence and denied the motion for mistrial. Appellant contends it was error for the court to fail to interrogate juror number 11 "to determine what, if anything, was observed."

 The trial judge found as a fact that appellant "lied" when he claimed he saw juror number 11 looking through the double doors at the rear of the courtroom. Given this finding, it clearly was no abuse of discretion to fail to interrogate the juror. We find no error here. Furthermore, if we assume there was such a viewing by any member of the jury, we see no error.

Appellant cites *Kindred v. State* (1989), Ind., 540 N.E.2d 1161, wherein we held a juror's observation of the accused in handcuffs in a security area near the courtroom did not entitle him to a mistrial, and attempts to distinguish it on the basis that Kindred was a known security risk and hence properly restrained. In actuality, however, the appellant's argument in *Kindred* seemed "to rest on the bald assertion that the jury's view of him in handcuffs unduly prejudiced his case;" yet there, we failed "to discern any harm to the defendant, because reasonable jurors could expect him to be in police custody while not in the courtroom." *Id.* at 1179. Here, where the juror's alleged exposure to any need to restrain appellant was *de minimus*, the same reasoning applies.

■ Moreover, a showing of grave peril is required to secure a mistrial, the denial of which requires an abuse of discretion be demonstrated for reversal. *Sharp v. State* (1989), Ind., 534 N.E.2d 708, *cert. denied* (1990), 494 U.S. 1031, 110 S.Ct. 1481, 108 L.Ed.2d 617. There is no such showing here.

Appellant contends the trial court erred in allowing over his objection the State to employ leading questions of its star witness to lay the foundation for admission of its Exhibit No. 21, the stick found under appellant's car. On direct examination, M.W. was asked, "... Did you ever have the opportunity to see the item that was held to your throat?" to which she replied, "No until ... I mean today; I saw it." The State continued, "I'm going to show you what's marked [as] State's Exhibit 21 and contents. As you sit here now, could you identify that as the item that was held to your throat?" M.W. replied, "Yeah." Appellant objected to the leading nature of the question on the basis she already had expressed no recollection of it.

■ Appellant recognizes the trial court has discretion to allow leading questions, citing *Hedges v. State* (1982), Ind., 443 N.E.2d 62, and will be reversed only for abuse, *King v. State* (1984), Ind., 460 N.E.2d 947, but goes on to maintain the reversal of M.W.'s response, occasioned by

the State's suggestion that she could nevertheless identify the stick, which in turn provided the basis for the exhibit's admission, was detrimental to his defense such as to amount to an abuse of discretion. As the State points out, however, a showing of substantial injury from the answer to a leading question is required to gain reversal, *Beland v. State* (1985), Ind., 476 N.E.2d 843, *overruled on other grounds, Schwass v. State* (1990), Ind., 554 N.E.2d 1127. Here, the State established the basis for admission of the same exhibit through the testimony of another witness, James Floyd, the evidence technician who processed the exhibit. Moreover, the stick itself was identified, and the fact it was used to assault M.W. was verified, by the testimony of the assailant himself, William Daniels, who as part of a plea bargain testified for the State. We see no reversible error here.

■ Appellant contends the trial court erred in allowing over his objection the witness M.W. to testify as to the genuineness of appellant's handwriting. She testified that during the summer of 1987, approximately three years prior to trial, she had received a handwritten letter signed "James Garrison" in which the writer explained he was "sorry for what we did to you. I know I can't turn back time ... I don't want to be in jail for the rest of my life." M.W. testified the letter, which unabashedly went on to ask her to consider how the writer's family would feel if he were sent to prison, made her so angry that she threw it away. The prosecution then asked her to compare her recollection of the letter's handwriting to that in State's Exhibit 31, known samples of appellant's handwriting and signature; she testified, "It looks like it."

Appellant objected and contends it was error to admit M.W.'s comparison testimony because she was not qualified as an expert in graphology. In addition, he cites, *inter alia*, the case of *Spencer v. State* (1958), 237 Ind. 622, 147 N.E.2d 581 for the proposition that a lay witness must show that she had frequently observed or handled a person's handwriting to be qualified

to give an opinion as to the genuineness of that person's signature. Appellant's cases, however, are inapposite to the facts involved here, where the genuineness of the exemplar is not in question. Under these circumstances, the singular basis of M.W.'s lay comparison went only to its weight, not its admissibility. *See Wolfe v. State* (1981), Ind., 426 N.E.2d 647.

Moreover, M.W.'s other testimony, as well as that of her sister R.W., was to the effect that the letter she received was from appellant, and was admitted without objection. Reversal may not be predicated on the erroneous admission of evidence when other evidence of the same probative value is admitted without objection. *Fozzard v. State* (1988), Ind., 518 N.E.2d 789. In any event, we see no reversible error here.

Appellant contends the trial court erred in denying his motion for judgment on the evidence and that the evidence was insufficient to support his convictions. He points out that none of the victims identified him as the perpetrator of any of the robberies, confinements or rape, or as even having been in the house. He argues that none of the elements of the crimes charged were proved without the testimony of his codefendant Daniels, which was rendered unworthy of credibility by reason of his plea bargain, which reduced his exposure from a potential 120–year sentence to a 20–year term.

■ Although it must be highly scrutinized, the testimony of an accomplice, standing alone, is sufficient to sustain a conviction. *Brown v. State* (1988), Ind., 529 N.E.2d 328. An accomplice's credibility is an issue for the jury to resolve. *Dennis v. State* (1986), Ind., 499 N.E.2d 736. Here, where the terms of Daniels' plea bargain were brought out on examination, the jury was properly apprised as to Daniels' potential for bias. *See Brown, supra.* There was in addition circumstantial evidence implicating appellant, including Daniels' references to "Jim" throughout the crime and appellant's apprehension in his car across the street from the victims' house. As Daniels' accomplice, of course, appellant was criminally liable as a principal for the acts committed by Daniels. Ind.Code § 35–41–2–4; *Fox v. State* (1986), Ind., 497 N.E.2d 221. The available evidence indicates appellant was the mastermind and used Daniels as a "front man." At any rate, the evidence was sufficient to support appellant's convictions, and denial of his motion for a directed verdict of acquittal was not error.

■ Appellant contends the trial court erred in denying his motion for mistrial based upon juror exposure to a newspaper article concerning him. After the jury had returned their verdicts but prior to the habitual offender phase of the trial, appellant informed the court that while being escorted back to his cell the previous evening, while walking past the open door to the jury room he had seen a newspaper spread out on the table along with pizza boxes from the jurors' supper. From this, appellant inferred the jury had been exposed to information that he was then currently serving a 90–year sentence for an unrelated burglary, also committed with Daniels' help, in violation of a motion *in limine.*

Out of the jury's presence, the trial court heard evidence from appellant, who had not seen which newspaper it was, from the escorting officer, who had not seen any newspaper in the jury room, and from the bailiff, who had seen an Indianapolis *Star* in the jury room but had not seen any reference to appellant when reading it that day. The court then ruled he would question the jury *en masse* and if they all reported having read no news accounts regarding appellant, he would overrule the motion for mistrial. When the jury was brought back in, each member responded in the negative to the court's inquiry.

Appellant cites *Bruce v. State,* 268 Ind. 180, 375 N.E.2d 1042, *cert. denied* (1978), 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662 for the proposition that once the likelihood of prejudice arises due to a newspaper's prejudicial content and the likelihood of juror exposure to it, unless either factor is absent or only minimally present the court must make further inquiry of the jurors regarding their exposure. Appellant goes

on to conclude that the trial court's inquiry here "was cursory and falls short of the standard discussed in *Bruce, supra.*" On the contrary, we fail to see, and appellant neglects to show us, how the court could have proceeded further upon receiving negative responses from all the jurors. Appellant here fails to demonstrate the grave peril required for a mistrial, *Sharp, supra,* the prejudice to his substantial rights required for reversal, *id.,* or, indeed, any prejudice at all.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER and KRAHULIK, JJ., concur.

DICKSON, J., concurs in result without separate opinion.