Prentice McIVER, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49A04–9409–CR–372.

Court of Appeals of Indiana.

July 31, 1995.

---

Aaron E. Haith, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Cynthia L. Ploughe, Deputy Atty. Gen., Indianapolis, for appellee.

1. Ind.Code 35–42–4–3.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Prentice McIver appeals from his conviction for four counts of child molesting, class B felonies.[1]

We affirm.

### ISSUES

I.   Whether the evidence is sufficient to support the convictions.

II.  Whether encounters with therapists and police improperly influenced the testimony of McIver's daughter, B.

III. Whether the trial court properly sentenced McIver to consecutive sentences.

### FACTS

The evidence most favorable to the verdict reveals that after McIver and his wife divorced in 1990, the two children of the marriage resided with their mother. McIver lived at his parent's home where his daughter, B.J., and his son, B., often visited. During the summer of 1992, B.J. and B. visited McIver. B. slept in a bedroom with McIver. Six year-old B.J. slept either in a bedroom with her grandmother, or on the sofa in the living room.

While sleeping on the couch one night, B.J. "got molested." (R. 161). B.J. recalled that she was awakened when McIver touched her chest. B.J. was lying with her back on the sofa when McIver got on top of her, and removed his underwear. McIver then touched B.J.'s vagina and put his penis inside her vagina. Thereafter, McIver turned B.J. over and began touching her inside her "butt" with his penis. B.J. knew the touching was occurring "inside" because "it hurted." (R. 167). McIver also touched her chest with his penis. Furthermore, he touched B.J.'s "private," "butt," and chest with his hands. (R. 168). B.J. knew McIver was touching her on the inside with his hands because "it hurted." (R. 170). The forego-

ing activities took place underneath B.J.'s pajamas.

Another night while B.J. was sleeping on the sofa, McIver woke her by touching her "butt" and back. McIver then put his hand inside her "private" and "it started hurt, hurting." (R. 174). McIver then got on top of B.J., rolled her over and began touching her "butt" with his hands on the "inside." (R. 175). McIver put his hands on "her chest and stuff, then he started touching [her] and stuff . . . on [her] back and [her] private and stuff." (R. 175). McIver rolled her over and "then he got his penis out, then he was touching [her] on [her] front part. (R. 176). McIver then rolled B.J. back over and touched her with "his penis on [her] back and [her] private and [her] butt." (R. 176). Thereafter, McIver went to bed.

Later that night, he began touching B.J. on her "private;" when she was about to scream, he put tape on her mouth and hands. He also put tape on B.J.'s legs because she was trying to kick him. McIver then began touching B.J. on her "private," chest, and "butt." While her legs and feet were taped, McIver put his penis inside B.J.'s vagina. (R. 225). McIver also touched B.J. on her "private" during the daytime when her grandmother and brother were in the garden. Additionally, McIver touched B.J. on her "private," "butt," and chest while wearing black gloves. (R. 230).

Dr. Roberta Hibbard is a pediatrician and associate professor of pediatrics at Indiana University School of Medicine. In her capacity as the director of the Child Sexual Abuse Clinic at Wishard Hospital, Dr. Hibbard examined B.J. on July 24, 1990, when B.J. was four and one-half years old. Dr. Hibbard described B.J.'s hymenal opening as measuring nine millimeters, and that the hymenal tissue was very narrow. She concluded that the findings of her examination were very suggestive of sexual abuse.

Dr. Hibbard also reviewed a report dated March 24, 1991, from the Wishard Hospital emergency room were B.J. was seen by emergency room doctors when she was approximately five years-old. In Dr. Hibbard's opinion, the findings, which included redness in the inner thighs, excoriation of the labia,[2] redness of the entire vulva, and dilation of the vaginal opening, were "certainly . . . very suggestive of sexual abuse." (R. 272).

Finally, Dr. Hibbard examined B.J. on October 22, 1992, when she was approximately six years old. The findings during this examination revealed labial redness, a new blood vessel formation with a scar at six o'clock on her hymen, thick and rounded-over hymenal edges, no existing hymenal tissue between the nine o'clock position and the twelve o'clock position, the hymenal opening measured ten millimeters, marked redness inside the anus, and bruising above the anus accompanied by a pooling of blood. Again, Dr. Hibbard concluded that these findings were very suggestive of sexual abuse.

A jury convicted McIver of child molesting, including one count which alleged McIver engaged in sexual intercourse with B.J., one count which alleged McIver inserted his finger into B.J.'s sex organ, one count which alleged he performed an act involving his sex organ and B.J.'s anus, and one count which alleged he inserted a finger into B.J.'s anus. The trial court imposed twenty year sentences upon McIver for each of the four counts. Additionally, the trial court ordered that counts II, III and IV run concurrently, and that count I run consecutively to counts II, III and IV. Additional facts will be presented in our discussion of the issues.

## DECISION

### I. SUFFICIENCY OF THE EVIDENCE

McIver now claims that "[t]here is a scintilla of evidence which only tends to support a conclusion of guilt, but, is insufficient to sustain the conviction. The [evidence] presented here does not support the conclusion of guilt beyond a reasonable doubt." Appellant's Brief at 16. Specifically, McIver claims "[t]his child displayed a great susceptibility to suggestion and displayed a vivid and uncontrolled imagination and assumption." *Id.*

2. Dr. Hibbard explained that a layer of skin had been rubbed or scratched off of B.J.'s labia.

For example, in support of his argument, he points to B.J.'s trial testimony wherein she explained that she assumed McIver had broken her leg and arm because she had bruises on her leg and arm. Also, B.J. admitted to having told the juvenile court judge that a black man touched her, but explained that she told that judge her father looks black in the dark. McIver also points out that B.J.'s claim that she slept alone on the sofa when visiting her father was not substantiated by her grandmother, McIver's mother, who claimed she and B.J. always slept together either in her bedroom or on the sofa. Furthermore, McIver claims that Dr. Hibbard's testimony "does not sustain the child's version of the case" because the medical reports do not directly link McIver with B.J.'s genital trauma. Appellant's Brief at 19.

■ In addressing the issue of sufficiency of the evidence, this court will affirm the conviction if, considering only the probative evidence and reasonable inferences supporting the verdict without weighing evidence or assessing witness credibility, a reasonable trier of fact could conclude that the defendant was guilty beyond a reasonable doubt. *Beatty v. State* (1991), Ind., 567 N.E.2d 1134, 1139.

■ Thus, despite the examples enumerated above, as well as several others advanced by McIver in his appellate brief, our review of the evidence outlined in FACTS indicates that it was reasonable for the jury to infer that McIver molested B.J. As the State points out, McIver challenged B.J.'s credibility during cross-examination, B.J. provided explanations for each challenge, and it is the function of the jury to determine B.J.'s credibility. Because we refuse to invade the jury's province, we must decline McIver's invitation to reweigh the evidence in his favor. The evidence is sufficient to sustain McIver's convictions for child molesting.

## II. ENCOUNTERS

■ Next, McIver posits that B.J.'s "testimony is tainted by the numerous counseling sessions and ... it would be impossible to determine what of her recollection might have been suggested by the counseling and repeated interviews" with police, therapists, her foster mothers, and prosecutors. Appellant's Brief at 22. Citing *Peterson v. State* (1983), Ind., 448 N.E.2d 673, wherein our supreme court considered the propriety of testimony derived through hypnosis, McIver claims B.J.'s "testimony and improved memory of the facts are quite similar to the testimony of a person whose recollections have been enhanced by hypnosis." Appellant's Brief at 22.

In an attempt to support his argument, McIver advances the following conclusions:

> The essential point is that B.J. went from a Black man in the trees entering her window to an allegation that her father appeared to be a Black man in the dark. She received repeated rehearsals and coaching by the persons engaged in the prosecution. There were new recollections of what supposedly occurred between herself and her father on the day of trial. She gained the ability to use the right terms such as would impress a jury. She became enrapt in the trial process and began to imagine and engage in fantasy with the apparent approval of the prosecution.

*Id.*

Our review of the record indicates that, in response to McIver's questions on cross-examination, B.J. explained she told the juvenile court judge a black man was hurting her because McIver appeared to be black in the dark. At no time during McIver's trial did B.J. claim anyone other than McIver molested her.

Furthermore, the record fails to reveal any evidence that B.J. received "repeated rehearsals and coaching." While B.J. did describe a "play trial" wherein, prior to trial, she picked out various dolls and stuffed animals to represent the key figures in McIver's trial, she expressly denied that anyone told

her what to say at trial. Additionally, McIver's claim that B.J. testified to new information at trial is simply not evident in the record before us.

As to B.J.'s knowledgeable use of words such as "molest," "vagina," and "penis," B.J. clearly explained that when she asked her foster mother why she was not living with her family, her foster mother told her it was because she had been molested. B.J. further explained that she had learned the other terms watching a "Kindergarten Cop" tape with her mother and from what apparently was a connect-the-dot picture.

Finally, there simply is no evidence that B.J. "became enrapt" with the trial process with the "apparent approval of the prosecution." What is evident from the record is that B.J. lived in the Guardian Home and two foster homes prior to trial. Thus, it is clear that because B.J. has been shuffled through "the system," her life has been anything but sheltered. As a result, she understood that the outcome of the trial could have an impact on whom she would live with in the future. However, there is no indication that anyone, including the prosecution, coached her testimony so as to ensure a conviction. In fact, B.J. denied that anyone told her what to say at trial, and indicated a distinct dislike for going to court "again and again and again...." (R. 214).

Without evidence of the memory enhancement McIver claims occurred, we must decline his invitation to provide guidelines for "preserving the pathology of the initial child memory." Appellant's Brief at 24. In any case, as the State points out, in an attempt to show that B.J.'s testimony was influenced by her contacts with various adults, McIver cross-examined B.J. at length concerning her contact with the prosecutor, her counselor, her mother, and her foster mothers. It was within the jury's purview to disbelieve McIver's explanation for B.J.'s testimony.

## III. SENTENCE

Finally, citing *Pearson v. State* (1989), Ind. App., 543 N.E.2d 1141, McIver claims the trial court failed to state a reason for imposing consecutive sentences on counts I and II. McIver's reliance is misplaced.

In *Pearson*, we noted that the trial court has wide discretion in determining whether imprisonment for multiple offenses should be served consecutively. *Id.* at 1144. We further noted that if, in fact, the trial court did choose to impose consecutive sentences, it must include a statement indicating the reasons for selecting that sentence. *Id.* The statement of reasons must contain three elements: (1) identification of all significant mitigating and aggravating circumstances found; (2) specific facts and reasons which lead the court to find the existence of each circumstance; and (3) articulation demonstrating that the mitigating and aggravating circumstances have been balanced in determining the sentence. *Id.* In *Pearson*, the trial court "failed to make any statement whatsoever when rendering Pearson's sentence." *Id.*

Here, however, the trial court did make a sentencing statement which provides as follows:

The Court having entered judgment of conviction on all four (4) counts find that your age to be thirty-eight (38), Mr. McIver. I do find that aggravating circumstances outweigh mitigating circumstances in this case. The uh, mitigating circumstances the fact you've been employed and a good worker, you do have health problems, and don't have any criminal history but clearly outweighed I think by the aggravating circumstances in this case in that you took advantage not only the age but the relationship you had with this victim in this case. She was your six (6) year old natural daughter. Uh, resulted in a very heinous sexual acts committed upon her resulted in physical and mental injuries. Uh, this took place over a period of time. It was a planned thought out process as well as the fact that the victim and the probation officer recommends an aggravated sentence.

(R. 601–2). The trial court clearly and properly articulated its reasons for imposing consecutive sentences.[3]

Affirmed.

RILEY and STATON, JJ., concur.

---

3. McIver does not take issue with the propriety of any of the aggravating factors listed by the trial court.